198 P.3d 666

Priscilla YOUNG, Plaintiff–Appellant,

v.

ALLSTATE INSURANCE COMPANY, a foreign corporation, Mark T. Ichiyama, and Does 1 through 10, Defendants–Appellees.

No. 26887.

Supreme Court of Hawai'i.

Dec. 26, 2008.

Carl M. Varaday of the Law Offices of Carl M. Varady, for Plaintiff–Appellant Priscilla Young.

Richard B. Miller and Patricia Kehau Wall of Tom Petrus & Miller LLLC, Honolulu, and Bennett Evan Cooper of Steptoe & Johnson LLP, for Defendants–Appellees Allstate Insurance Company and Mark T. Ichiyama.

MOON, C.J., NAKAYAMA, and DUFFY, JJ., LEVINSON, J., concurring and dissenting, with whom ACOBA, J., joins.

Opinion of the Court by NAKAYAMA, J.

Plaintiff–Appellant Priscilla Young ("Young") appeals from the third circuit court's [1] ("circuit court") September 17, 2004 final judgment in favor of Defendant–Appellee Allstate Insurance Company ("Allstate") and Defendant–Appellee Mark T. Ichiyama ("Ichiyama") (collectively referred to as "Defendants").

On appeal, Young argues the circuit court erred by granting Defendants' motion to dismiss Young's complaint for failure to state a claim where Defendants are liable for (1) abuse of process, (2) malicious defense, (3) assumed duty of good faith and fair dealing, and (4) intentional infliction of emotional distress ("IIED") for making false allegations about her, refusing to settle, and appealing the arbitration award in furtherance of Allstate's policies. Based upon the following analysis, we (1) affirm the circuit court's September 17, 2004 judgment in favor of Defendants on Young's claims for abuse of process, malicious defense, and breach of an assumed duty of good faith and fair dealing, (2) vacate the circuit court's September 17, 2004 judgment on Young's IIED claim, and (3) remand the case for further proceedings.

## I. BACKGROUND

### A. Factual History

Because the circuit court dismissed Young's first amended complaint, pursuant to Hawai'i Rules of Civil Procedure ("HRCP") Rule 12(b)(6), on the basis that it failed to state a claim upon which relief could be granted, we take the complaint's factual allegations as true for purposes of this appeal. *See Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel,* 113 Hawai'i 251, 266, 151 P.3d 732, 747 (2007) (observing that, " 'in reviewing the circuit court's order dismissing the plaintiffs' complaint in this case, our consideration is strictly limited to the allegations of the complaint, and we must deem those allegations to be true' " (quoting *Dunlea v. Dappen,* 83 Hawai'i 28, 32, 924 P.2d 196, 200 (1996), *overruled on other grounds by Hac v. Univ. of Hawai'i,* 102 Hawai'i 92, 105–07, 73 P.3d 46, 59–61 (2003))). The first amended complaint included the following factual allegations.

### 1. Allstate's "Claim Core Redesign Process"

In the mid–1990s, Allstate devised a plan to redesign the process by which it handled personal injury claims. This plan was referred to in internal implementation training manuals as the "Claims Core Process Redesign" or "CCPR." Excerpts of those manuals were attached as exhibits to the first amended complaint. The CCPR plan was intended to increase profits by over $200,000,000.00 annually by underpaying claims and denying claimants just and reasonable compensation. According to the CCPR manual, one of the plan's primary goals was to "manage specific components of severity (average amount paid per claim) to provide greater financial support to the company."

One such component was the rate at which claimants were represented by legal counsel. Allstate's CCPR manual directed claim representatives to "realiz[e] that the way we approach claimants and develop relationships will significantly alter representation rates and contribute to lower severities." The manual explained that "when an attorney represents a claimant, we pay 2–3 times more to settle the claim." Consequently, Allstate instructed its claim personnel to "do whatever it takes to remove any need for an attorney."

---

1. The Honorable Greg Nakamura presided.

Allstate implemented this directive by requiring representatives to "[e]stablish a trust-based relationship" with claimants through "[e]xtremely rapid contact to educate claimants about Allstate's approach to fair claim settlement" and through "[a]nticipation and resolution of a broad range of claimant needs in a genuine and emphatic manner." Representatives were also directed to initiate a "[p]roactive discussion of attorney economics" with claimants through this process, and to follow up regularly with claimants "to reduce the need for attorney involvement." In addition to oral assurances, Allstate representatives were supposed to provide a written "quality service pledge." The pledge informed claimants that, "[b]ecause you have been involved in an accident with an Allstate policyholder, we will provide you with quality service." The pledge additionally stated that Allstate "will make an appropriate offer of compensation for any injuries you may have suffered."

By dissuading claimants from seeking legal counsel, Allstate was able to prey upon injured and unrepresented claimants' trust and lack of knowledge and to deny or settle claims for a fraction of their value. In handling minor-impact, soft-tissue or "MIST" claims, Allstate calculated settlement offers through its "Colossus" computer valuation system.[2] Allstate's CCPR manual instructed adjusters that, "[w]hile every case should be evaluated on its merits and adjustments in settlement value will often be required, the new evaluation approach should lead to more settlements in the base value range and fewer settlements greater than the historical median." The Colossus system was intended to create unreasonably low evaluations and settlements for personal injury claims.

If a settlement offer were not accepted or the claimant hired an attorney, Allstate would fully litigate virtually every claim, irrespective of its insured's liability or the real physical harm and value of the injuries suffered by the claimant. Allstate thereby sought to subject claimants to unnecessary and oppressive litigation and expenses, or, in other words, "scorched-earth litigation tactics." Allstate intended to force claimants and their attorneys through arbitration and trial unnecessarily. For example, if a non-binding arbitration award were anything more than nominal, Allstate's practice was to appeal the award. The insurer employed these tactics to discourage claimants from pursuing injury claims. Allstate also sought to discourage attorneys from representing claimants by creating so much work and expense that they could not afford to advocate for a client with minor, moderate, or sometimes even serious injuries.

Aside from the rate at which claimants were represented by counsel, another significant severity component was the amount paid for bodily injury claims. According to the CCPR manual: "Of the components that account for paid losses, [bodily injury] is by far the largest. Controlling loss payout is clearly the most effective means of controlling casualty costs." The manual illustrated that a five percent reduction in the amount paid on bodily injury claims would yield profits of $201,000,000.00 per year. The manual gave specific instructions to representatives handling MIST claims, which typically arose from minor-impact automobile accidents that caused connective tissue, organ, or muscle damage, but not broken bones.

According to the CCPR manual, MIST claims rarely reached trial, "because on a case-by-case basis, a settlement [could] be justified when litigation costs [were] considered." Consequently, Allstate instructed its claim representatives to meet with the claimants' attorneys to emphasize those costs—i.e., "attorney economics"—through threats, intimidation, and strong-arm tactics. Representatives were directed "[t]o send a message to attorneys of [Allstate's] proactive defense stance on MIST cases," which "force[d] the claimant and attorney to think about the obstacles they must overcome to recover a

---

**2.** The system determined the "Base Value" for MIST claims, which was the "minimum level of likely settlement as represented by the historical settlement level for the lowest 10% of claims settled." The system also calculated the "Medi-an Value," which was the "settlement level below which 1/2 of all claims settled." Once a claim's value was determined, an Allstate evaluation consultant would reduce the value by taking "offsets."

significant settlement or the benefits of a small 'walk-away' settlement."

Allstate carried out its policies through the active participation of its attorneys. The "Litigation Management" section of the CCPR manual segmented, or targeted, certain claims for litigation and trial. One such litigation segment was referred to as "Settle for 'X' or less—default to trial." In outlining the nature of such cases, the manual noted that the "[p]rimary reason [that the] case [wa]s being defended [wa]s that [the] plaintiff ha[d] not accepted Allstate's offer." Once a case was targeted for trial under the "Settle for 'X' or less" segment, an Allstate attorney was "required" to "appeal [the] non-binding arbitration/mediation award as directed by [the] claim rep[resentative]." Likewise, an "intended resolution" by Allstate's claim representative to "try [a] case" had to be followed by Allstate's staff counsel. Allstate's attorneys were required to "increase trial activity in appropriate cases," such as "where settlement [could not] be reached for [the] evaluated amount." The reason that Allstate's attorneys were expected to have "more trials" was to "reduce loss payout."

Allstate used incentive compensation programs to encourage its attorneys to try more cases, irrespective of whether such litigation was justified by the facts. For Allstate's staff attorneys, increased trial activity was an objective set forth in the CCPR manual, with compensation and financial reward programs for the attorneys who met CCPR objectives. The more cases they tried, the more they might qualify for awards and salary increases. Allstate's attorneys' performance was also measured by whether they achieved results at or below the evaluated claim amount. Allstate's managing attorneys were expected to monitor their staff counsel aggressively. For example, under the CCPR manual, one corrective action for poorly performing offices was to "put managing attorney bonuses at risk or change [the] managing attorney."

### 2. *Young's February 4, 1998 automobile accident with Allstate's insured*

On February 4, 1998, Young was stopped in traffic in Hilo, Hawai'i, when a car operated by an Allstate-insured driver, Daryl Fu-

jimoto ("insured"), hit the rear of Young's 1984 Ford. The insured informed Allstate that he fell asleep while driving and caused the crash. As a result of the collision, Young's automobile (worth about $1,795) was destroyed, and Young, who was eighty-four years old at the time of the accident, sustained injuries to her neck, ribs, right knee, and thoracic and lumbar spine. Young had difficulty performing activities of daily living and, consequently, began suffering from depression.

### 3. *Allstate's pledges to Young*

An Allstate claim representative contacted Young on the same day of the collision and informed her that "Allstate would provide 'quality service' on her claim, treat her fairly, and [ ] that, because of these promises, she did not need any attorney." Shortly thereafter, Young received a letter dated February 4, 1998 from Allstate, which stated: "I want to reaffirm Allstate's policy that we will provide quality service to anyone who has been involved in an accident with one of our policyholders. As your claim representative, my role is to ensure that you receive this quality service, outlined in the enclosed 'Quality Service Pledge.'" Accompanying the letter was a "QUALITY SERVICE PLEDGE," which stated that "YOU'RE IN GOOD HANDS WITH ALLSTATE" and that:

> *Because you have been involved in an accident with an Allstate policyholder, we will provide you with quality service. In an effort to provide you with this quality service, we promise you the following:*
>
> 1) *We will* fully explain the process, take the time to answer all questions and concerns that you may have, and keep you informed throughout the claim process.
>
> 2) *We will* conduct a quick, fair investigation of the facts in your case.
>
> 3) To the extent that our policyholder was at fault in the accident, *we will* assist you in providing for the repair of your vehicle and in determining your temporary transportation needs.

*Your claim professional is dedicated to carrying out this Quality Service Pledge.* (Emphases in original.)

Thereafter, Allstate sent a second letter to Young requesting that she authorize Allstate to gather her medical and employment information to evaluate her injury claim. The quality service pledge attached to the second letter differed from the pledge attached to the first letter to the extent that the third promise, which concerned transportation and vehicular repair, instead stated: "3) If you qualify, *we will* make an appropriate offer of compensation for any injuries you may have suffered." (Emphasis in original.)

Young relied upon Allstate's oral and written representations, believing that she did not need an attorney and that Allstate would treat her fairly, just as it would be expected to treat one of its own customers. As a result of those representations, Young attempted to resolve her bodily injury claim directly with Allstate without advice or assistance from an attorney. Additionally, Young released her medical information to Allstate.

### 4. *Allstate offered Young $5,000 and then raised its offer to $5,300*

On March 15, 1999, when Young had already incurred over $6,000 in medical expenses and was still receiving medical care for her injuries, Allstate offered Young $5,000 to settle her claims and release Allstate and the insured from liability. Allstate represented that it "fairly evaluated [Young's] injury claim for settlement" and that Young's no-fault insurance coverage should pay for her accident related treatment.

Young rejected the $5,000 offer, and on April 22, 1999, Allstate raised its offer to $5,300. It presented the offer to Young, who it knew was still unrepresented by counsel, together with a joint tortfeasor release and indemnity agreement for her signature. Allstate was aware that Young was permanently injured, then eighty-five years of age, and in a very vulnerable position. In making the offer, Allstate represented to Young that she

**3.** *See* HRCP Rule 68 ("If the judgment finally obtained by the offeree is not more favorable

had sustained mere minor injuries and that she should accept the offer. Young was deeply distressed because she felt that Allstate was breaking its promises and violating its pledge to fairly evaluate her claim. She therefore sought the assistance of an attorney, who attempted to negotiate a fair settlement with Allstate, but Allstate refused to make any offer beyond $5,300.00.

### 5. *Jury awarded Young $198,971.71 in the underlying case*

On April 17, 2000, Young filed suit against the insured, seeking fair compensation for her injuries sustained from the February 1998 car crash. Allstate, through its attorney, Ichiyama, filed an answer on December 18, 2000, alleging, among other things, that Young was injured by her own negligence and that she failed to mitigate her injuries. The defenses caused Young, who was eighty-seven years old at the time, extreme distress and shame.

After Young's deposition, Ichiyama indicated that he would recommend that Allstate pay Young its insured's $25,000 limit of coverage. Still, Allstate refused to increase its offer. The case proceeded to the court annexed arbitration program, but the Defendants never took the arbitration seriously; they entered the arbitration hearing with the intention of appealing any award that exceeded a nuisance value for the claim.

On June 12, 2001, the arbitrator awarded Young medical expenses of $7,689.51 and general damages of $37,000, for a total award of $45,189.15. On June 26, 2001, Ichiyama filed a notice of appeal requesting a trial *de novo*.

The circuit court ordered the parties to participate in mediation, which was unsuccessful because Allstate refused to improve its nuisance offer of $5,300.00.

Thereafter, on July 19, 2001, Young filed a HRCP Rule 68 [3] "general damages only" offer of judgment for $25,000. Allstate rejected Young's offer, and, in November 2001, it filed an offer of judgment for $5,300. Young again rejected this offer.

than the offer, the offeree must pay the costs incurred after the making of the offer.").

Following a four-day jury trial in January 2002, the jury awarded Young a total of $198,971.71 (special damages of $11,971.71 and general damages of $187,000). Allstate offered Young $260,000 to settle the lawsuit and give up "any right to bring a suit for bad faith" against Allstate. However, Young rejected that offer because she wanted to "expos[e] Allstate's misconduct on her claim and case to other members of her community."

On April 8, 2002, at Young's request and over the opposition of Defendants, the court awarded Young attorney's fees of $15,000, costs pursuant to Hawai'i Revised Statutes ("HRS") § 607–9 of $3,334.48, and costs pursuant to Hawai'i Arbitration Rules ("HAR") Rule 26(B)(1).[4] The circuit court also awarded Young $35,090.03 in prejudgment interest.

## B. Procedural History

On May 15, 2003, Young filed a complaint against Defendants. The following month, she filed her first amended complaint, alleging that she was a victim of Allstate's plan, "Claim Core Process Redesign," because Allstate formed a trust-based relationship with her to coerce her into accepting a low settlement offer. Young argued that Defendants refused to make her a reasonable offer and forced the case through arbitration, then appealed the arbitration award and forced her through a jury trial, and finally, contested her motions for attorneys' fees and costs sanctions and prejudgment interest. Young argued that these tactics "were designed for one purpose: to drive up [her] costs and to coerce, intimidate and punish [Young] for refusing to accept Allstate's $5,300 offer and getting an attorney." Young asserted Defendants were liable for, among other things, (1)

abuse of process, (2) malicious defense, and (3) IIED, and that Allstate had breached an assumed duty of good faith and fair dealing. For each claim, she requested compensatory and punitive damages.

On June 25, 2003, Defendants filed a motion to dismiss Young's complaint ("motion to dismiss") under HRCP Rule 12(b)(6)[5] for failure to state a claim for which relief may be granted. In support of their motion, Defendants argued: (1) Defendants did not abuse process by refusing to make reasonable settlement offers, appealing the arbitration award, and alleging affirmative defenses in their answer because these acts were not judicial and, even if they were judicial, Defendants acted with the purpose for which the judicial processes are intended; (2) Hawai'i has not recognized a claim for relief of malicious defense; (3) Allstate did not owe Young a duty of good faith and fair dealing because the parties did not have a contractual relationship by virtue of Allstate sending Young its pledge; and (4) Defendants did not act "without just cause or excuse and beyond all bounds of decency" by defending the insured against Young's lawsuit and therefore, are not liable for IIED.

On July 28, 2003, Young filed a memorandum in opposition to Defendants' motion to dismiss. The circuit court heard the motion on August 5, 2003.

Young's abuse of process claim asserted that the Defendants had used legal process against her for an ulterior purpose not proper in the regular conduct of the proceedings—to send a message to claimants and attorneys and to punish Young and her attorney through excessive litigation expenses, harassment, oppression, and abuse. Accord-

---

4. HAR Rule 26 provides that "the trial court may, in its discretion, impose sanctions, … against the non-prevailing party whose appeal resulted in the trial *de novo.*" The prevailing party, defined in HAR Rule 25 as the party that "did not appeal and the appealing party failed to improve upon the arbitration award by 30% or more," may be awarded "[r]easonable costs and fees (other than attorneys' fees) actually incurred by the party but not otherwise taxable under the law, including, but not limited to, expert witness fees, travel costs, and deposition costs" and attorneys' fees not to exceed $15,000. HAR Rule 26.

5. HRCP Rule 12(b)(6) provides in pertinent part:
   [T]he following defenses may at the option of the pleader be made by motion: … (6) failure to state a claim upon which relief can be granted…. If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

ing to Young, the Defendants' conduct was part of a nationwide practice, employed in Hawai'i, to use litigation, discovery procedures, arbitrations, appeals from arbitrations, and trials as "a war of attrition." Young alleged that the Defendants did not intend to make any reasonable attempt to address or litigate the merits of the case. She also alleged that Ichiyama, while carrying out the instructions, wishes, and intent of his principal and employer, Allstate, engaged in the misuse of process and imprudent use of the courts for an end other than that for which they were designed. Relying on *Wong v. Panis,* 7 Haw.App. 414, 420–21, 772 P.2d 695, 699–700 (1989), *abrogated on other grounds by Hac,* 102 Hawai'i at 105–07, 73 P.3d at 59–61, the circuit court explained that settlement was a proper purpose of judicial process. As such, the circuit court concluded that Young's allegations did not state a claim for which relief could be granted.

With respect to her "malicious defense" claim, Young alleged that the Defendants took an active part in the initiation, continuation, or procurement of the defense in Young's case against Allstate's insured. She alleged that the Defendants (1) maliciously defended the case and used the courts imprudently by acting without reasonable or probable cause and by acting with knowledge or notice that their positions lacked merit and (2) acted primarily for a purpose other than that of securing a proper adjudication of the claims and defenses, such as to harass, annoy, or injure or to cause an unnecessary delay or a needless increase in litigation costs. Despite these tactics, the underlying proceedings culminated in Young's favor. The circuit court declined to recognize the tort of "malicious defense" because it believed that a defendant, who has been haled into court involuntarily, should not be required to elect whether to vigorously defend and suffer the prospect of an additional lawsuit or to defend less vigorously. The circuit court further reasoned that, in cases in which a defendant acts improperly, sanctions could be imposed.

Young's IIED claim asserted that, at all material times, the Defendants were aware that Young was an elderly woman who was in pain, incapacitated in her ability to care for herself, suffering from depression as a result of the injuries she sustained in the February 4, 1998 collision, and relying upon a fair recovery of the damages that she had sustained. Young alleged that the Defendants anticipated that, because of her age, Young might not survive to recover through the courts, and that when Young came to that realization, she would accept a nominal settlement amount. In short, Young asserted that the Defendants, through their abusive legal processes and malicious defense of Young's claims for personal injury damages, appealed the arbitration award and forced her to go to trial in order to obtain a fair recovery for her injuries, with the intention of inflicting severe emotional distress upon Young. The circuit court concluded that the Defendants' acts were not without just cause or excuse or beyond all bounds of decency or outrageous.

With respect to the claim of "assumed" duty of good faith and fair dealing, Young alleged that Allstate had advised her that it would address her claim pursuant to a quality service pledge, in which Allstate promised her that (1) her third-party claim would be handled fairly and in a relationship of trust and (2) it would make a fair and appropriate settlement offer to her. According to Young, by making these representations, Allstate assumed a duty of good faith and fair dealing in handling Young's claims that arose out of the February 4, 1998 collision and then breached that duty by intentionally engaging in abusive and unfair practices. The circuit court concluded that these allegations failed to state a claim for which relief could be granted, because Allstate's representations did not result in an assumption by Allstate of a duty of good faith and fair dealing.

The circuit court entered an order dismissing Young's claims of abuse of process, malicious defense, IIED, and assumed duty of good faith and fair dealing on July 19, 2004, and entered its final judgment on September 17, 2004. Young filed a timely notice of appeal on October 8, 2004.

## II.  STANDARD OF REVIEW

■  We review a circuit court's ruling on a motion to dismiss *de novo.   Sierra Club v.*

*Dep't of Transp.*, 115 Hawai'i 299, 312, 167 P.3d 292, 312 (2007). We have long adhered to the established principle that:

> [a] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief. We must therefore view a plaintiff's complaint in a light most favorable to him or her in order to determine whether the allegations contained therein could warrant relief under any alternative theory. For this reason, in reviewing [a] circuit court's order dismissing [a] complaint . . . our consideration is strictly limited to the allegations of the complaint, and we must deem those allegations to be true.

*Blair v. Ing*, 95 Hawai'i 247, 252, 21 P.3d 452, 457 (2001) (citations omitted) (formatting altered).

## III. DISCUSSION

On appeal, Young contends that she is entitled to damages based on four claims for relief: abuse of process; malicious defense; assumed duty of good faith; and IIED. Young's allegations do not support her claims of abuse of process and assumed duty of good faith, and we decline to recognize the tort of "malicious defense." However, the circuit court erred by concluding that Young failed to state a claim of IIED for which relief could be granted and dismissing this claim. Therefore, we vacate the circuit court's judgment as to Young's IIED claim and remand the case for further proceedings.

### A. The Circuit Court Did Not Err In Dismissing Young's Claim For Abuse Of Process.

This court has declared that there are two essential elements in a claim for abuse of process: "(1) an ulterior purpose and (2) a wilful act in the use of the process which is not proper in the regular conduct of the proceeding." *Chung v. McCabe Hamilton & Renny Co., Ltd.*, 109 Hawai'i 520, 529, 128 P.3d 833, 842 (2006) (quoting *Wong*, 7 Haw. App. at 420, 772 P.2d at 699–700, *abrogated in part* by *Hac*, 102 Hawai'i 92, 73 P.3d 46) (internal quotation marks omitted); *see also* Restatement (Second) of Torts · ("Restatement of Torts") § 682 (1977) ("One who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process.").

Preliminarily, the Defendants argue that the circuit court correctly dismissed Young's claim of abuse of process because "none of the alleged acts involved the use of judicial process." [6] As the Supreme Court of California stated, however, " '[p]rocess,' as used in the tort of 'abuse of process,' . . . has been interpreted broadly to encompass the *entire range of 'procedures' incident to litigation.*" [7] *Barquis v. Merchants Collection Ass'n*, 7 Cal.3d 94, 104 n. 4, 496 P.2d 817, 824 n. 4, 101 Cal.Rptr. 745, 752 n. 4 (1972) (em-

---

6. Additionally, the Defendants argue that the tort of abuse of process "requires improper use of 'judicial process' " and seek to define "process," as some courts have held, as judicial procedures that compel a party to undertake or forbear from an act. *See, e.g., Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n*, 38 N.Y.2d 397, 403, 343 N.E.2d 278, 283, 380 N.Y.S.2d 635, 642 (1975). Defendants rely on *Wilcox v. Berrey*, 16 Haw. 37 (Terr.1904), in which this court quoted a Massachusetts decision for the proposition that " '[t]he common law action for abusing legal process is confined to the use of process for the purpose of compelling the defendant to do some collateral thing which he could not lawfully be compelled to do.' " 16 Haw. at 43 (quoting *Johnson v. Reed*, 136 Mass. 421, 423 (1884)). The foregoing quotation dictates that the process must be used for the *purpose* of compelling a person to act, but it does not require that the process must *itself* compel that act. *See id.; see also Shaw v. Fulton*, 266 Mass. 189, 165 N.E. 26, 27 (1929) (holding that, under the *Johnson* rule, the plaintiff lacked a claim for abuse of process, because "there was no attempt on the part of [the defendant] or his partners to use the process for *purposes* of extortion" (emphasis added)). Thus, *Wilcox* is not instructive in defining the scope of the word "process."

7. *See Barquis v. Merchants Collection Ass'n*, 7 Cal.3d 94, 104 n. 4, 496 P.2d 817, 824 n. 4, 101 Cal.Rptr. 745, 752 n. 4 (1972) ("This broad reach of the 'abuse of process' tort can be explained historically, since the tort evolved as a 'catch-all' category to cover improper uses of the judicial machinery that did not fit within the earlier established, but narrowly circumscribed, action of malicious prosecution.").

phasis added).[8] Here, Young's first amended complaint alleged that Defendants used process when they (1) appealed the arbitration award and forced the dispute to trial, (2) raised affirmative defenses in Fujimoto's answer, (3) made an HRCP Rule 68 offer of judgment, and (4) opposed Young's motions for attorneys' fees, costs, and prejudgment interest. These allegations sufficiently support that Defendants resorted to "process," inasmuch as these actions utilized procedures that were incident to the litigation.[9] Accordingly, we next address whether Young's allegations sufficiently state that (1) the Defendants had an "ulterior purpose" and (2) performed "a wilful act in the use of the process which is not proper in the regular conduct of the proceeding."

### 1. *"ulterior purpose"*

■ In addressing whether the defendant used process primarily for an " 'ulterior purpose,' " the circuit court relied on the ICA's decision in *Wong.* The plaintiff in that case asserted that the defendants had committed an abuse of process by filing counterclaims and by asking him and his wife abusive questions during oral depositions and through written interrogatories in order to harass him and coerce him into either withdrawing his complaints in other actions or settling those claims for less than he was entitled to recover. 7 Haw.App. at 417, 772 P.2d at 698, 700. The circuit court entered summary judgment in the defendants' favor with respect to the plaintiff's abuse of process claim. *Id.* at 418, 772 P.2d at 698. On appeal, the ICA, examined this tort, as follows:

> Liability for abuse of process is imposed when the putative tortfeasor uses legal process "primarily" for an ulterior motive.

The significance of [the word "primarily"] is that there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is an *incidental motive of spite or an ulterior purpose of benefit to the defendant*
. . . .

> For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended.

*Id.* at 420–21, 772 P.2d at 700 (citing Restatement of Torts § 682 comment b) (emphasis added). It noted the plaintiff's argument that the defendant used process for the purpose of settlement, as well as "to have [plaintiff] expend funds to defend himself from the counterclaims, [and] to harass and embarrass him . . . ." *Id.* at 421, 772 P.2d at 700. The ICA held that, "[s]ince the counterclaims and the questions, by [the plaintiff's] own admission, were asserted for the purpose of settlement, the 'improper' motives ascribed by him to [the d]efendants were incidental." *Id.*

■ In the case at bar, the circuit court correctly applied *Wong* when it essentially concluded that, because settlement is a valid litigation objective and because the first amended complaint alleged that the Defendants employed process in order to settle the underlying case, Young had failed to state an abuse of process claim. We do not, however, agree with the ICA's analysis in *Wong.* It rests on the false premise that, if process is used for at least one valid purpose, such as settlement, then any invalid purpose is "incidental" and the valid purpose is "primary." *See id.* A purpose may be legitimate and yet, at the same time, incidental. *See Levert v. Philadelphia Int'l Records,* Civil Action No. 04–1489, 2005 WL 2789099, *5, 2005 U.S.

---

8. *See also Nienstedt v. Wetzel,* 133 Ariz. 348, 651 P.2d 876, 880 (Ct.App.1982); *Groen v. Elkins,* 551 N.E.2d 876, 879 n. 3 (Ind.Ct.App.1990); *Greenberg v. Wolfberg,* 890 P.2d 895, 905 n. 47 (Okla.1994); *Rosen v. Am. Bank,* 426 Pa.Super. 376, 627 A.2d 190, 192 (1993); *Food Lion, Inc. v. United Food & Commer. Workers Int'l Union,* 351 S.C. 65, 567 S.E.2d 251, 253 (Ct.App.2002); *Foothill Industrial Bank v. Mikkelson,* 623 P.2d 748, 757 (Wyo.1981).

9. *See Crackel v. Allstate Ins. Co.,* 208 Ariz. 252, 92 P.3d 882, 887, 892 (Ct.App.2004) (concluding that Allstate employed "process" by asserting a

contributory negligence defense, serving an offer of judgment, and appealing an arbitration award); *see also* HRCP Rule 30 (setting for the procedure for filing an answer); Hawai'i Arbitration Rules Rule 22 (authorizing parties to appeal from court annexed arbitration program awards); HRCP Rule 68 (permitting parties to make offers of judgment); HRCP Rules 38 through 53 (addressing trial procedures); Rules of the Circuit Court of the State of Hawai'i Rule 7(b) (providing that parties may file memoranda in opposition to motions).

Dist. LEXIS 25012, at *16 (E.D.Pa. Oct. 26, 2005) ("If plaintiffs' *primary* purpose in seeking injunctive relief was not legitimate, defendants' abuse of process claim can survive, even if plaintiffs' *secondary* purpose was legitimate." (emphases in original)). We therefore overrule *Wong* on this score and hold that a defendant's use of process for a proper purpose does not necessarily mean that he used the process primarily for that purpose.

■ In this case, the first amended complaint alleges that the Defendants used process in order to prevail in the underlying case through trial or settlement. While that general aim was clearly legitimate in the regular conduct of the underlying case, it also alleged that the Defendants used process to implement the CCPR plan, employing "scorched earth litigation tactics" to punish Young and to "send a message" to claimants and the plaintiffs' bar nationwide. In our view, that objective is patently illegitimate.[10] Whether that improper purpose was, in fact, the Defendants' primary motivation constitutes a question of fact that cannot be resolved by way of an HRCP Rule 12(b)(6) motion to dismiss. *See Givens,* 75 S.W.3d at 403 (concluding that, although the defendants may have used interrogatories and subpoenas solely for their lawful and intended purpose of gathering information relating to the merits of the case, their intention involved a question of fact not properly decided on a motion to dismiss). Accordingly, we conclude that the allegations sufficiently state that the Defendants employed process primarily for an ulterior purpose.

2. *"a wilful act in the use of process which is not proper in the regular conduct of the proceeding"*

■ We next reach the second element of the abuse of process claim: whether the de-

fendant committed " 'a wilful act in the use of the process which is not proper in the regular conduct of the proceeding.' " *Chung,* 109 Hawai'i at 529, 128 P.3d at 842 (quoting *Wong,* 7 Haw.App. at 420, 772 P.2d at 699–700). Young fails to identify such an act by Allstate.

Young appears to allege that, by advancing unreasonably low settlement offers, Allstate engaged in improper willful acts. Offers to settle the claims at issue in a case are "proper," if not encouraged, in the regular conduct of proceedings. *See Wong,* 7 Haw.App. at 420, 772 P.2d at 700 ("[S]ettlement 'is includable in the goals of proper process' ") (quoting *Myers v. Cohen,* 5 Haw.App. 232, 244, 687 P.2d 6, 15 (1984)); *Coleman v. Gulf Ins. Group,* 41 Cal.3d 782, 793, 718 P.2d 77, 82, 226 Cal.Rptr. 90, 95 (1986). A contrary rule would have a "devastating effect on the settlement process," because parties would be wary of making settlement offers if such offers could provide the "essential ingredient" to subject them to a second lawsuit for abuse of process. *Coleman,* 41 Cal.3d at 793, 718 P.2d at 82, 226 Cal.Rptr. at 95.

■ Aside from the settlement offers, the only other willful act alleged in the first amended complaint was the Defendants' use of process itself. The most recent edition of Professor Prosser's treatise on torts teaches that *"[s]ome definite act or threat* not authorized by the process, or aimed at an objective not legitimate in the use of the process, *is required;* and *there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."* *Prosser and Keeton on Torts* § 121, at 898 (5th ed., W. Page Keeton *et al.* eds., 1984) (emphases added) (footnotes omitted).[11]

---

**10.** *See Crackel v. Allstate Ins. Co.,* 208 Ariz. 252, 92 P.3d 882, 890 (Ct.App.2004) (concluding that, in using court procedures pursuant to the CCPR plan, Allstate improperly used "the prospect of sustained and expensive litigation as a 'club' in an attempt to coerce [the claimants], and similarly situated claimants, to surrender those causes of action that sought only modest damages"); *Nienstedt,* 651 P.2d at 882 (recognizing that discovery procedures were used for an ulterior purpose where they were employed "to expose the

injured party to excessive attorney's fees and legal expenses"); *Givens v. Mullikin,* 75 S.W.3d 383, 402 (Tenn.2002) (concluding that it was improper to employ discovery procedures in order "to wear the mettle of the opposing party to reach a favorable termination of the cause unrelated to its merits").

**11.** This court's articulation of the willful act requirement derives from Professor Prosser's treatise on torts. *See Chung,* 109 Hawai'i at 529,

Thus, more is required than the issuance of the process itself. *See Coleman,* 41 Cal.3d at 802, 718 P.2d at 89, 226 Cal.Rptr. at 101–02, *Simone v. Golden Nugget Hotel & Casino,* 844 F.2d 1031, 1038, 1040 (3d Cir.1988) (applying New Jersey law); *Clermont Environmental Reclamation Co. v. Hancock,* 16 Ohio App.3d 9, 474 N.E.2d 357, 361 (1984); *Kaminske v. Wisconsin Cent. Ltd.,* 102 F.Supp.2d 1066, 1078–79 (E.D.Wis.2000).

Young urges this court to follow case law of other jurisdictions that have expanded the tort of abuse of process to encompass circumstances in which there was no act apart from the issuance of process. *See Nienstedt,* 651 P.2d at 879–80 (holding that filing a motion for a protective order that was premised on factual misrepresentations was a use of legal process not justified or employed for the legitimate or reasonably justifiable purpose of advancing the moving parties' interest in the litigation); *Givens,* 75 S.W.3d at 402–03 (holding that the defendant issued process without any reasonably justifiable purpose of advancing its legitimate interests in the litigation because the defendant issued more than two hundred thirty interrogatories and put the plaintiff through an eight-hour deposition, even though much of the information requested was either already in the defendant's possession or not relevant to the issues in the litigation). These cases have essentially held that using process itself will constitute the requisite willful act where a party's use of procedures is "not justified or used for legitimate or reasonably justifiable purposes of advancing [his] interests." *Nienstedt,* 651 P.2d at 882; *see also Crackel,* 92 P.3d at 889, 892; *Givens,* 75 S.W.3d at 402. In our view, this lack-of-justification requirement serves the same function as the element of a malicious prosecution claim requiring that "the prior proceedings were initiated without probable cause." *See Wong v. Cayetano,* 111 Hawai'i 462, 478, 143 P.3d 1, 17 (2006).

The tort of malicious prosecution, however, differs from the tort of abuse of process, because it requires that the prior proceedings must have *terminated* in the plaintiff's favor. *See Wong,* 111 Hawai'i at 478, 143 P.3d at 17. Yet, if the willful act requirement of the tort of abuse of process could be satisfied by showing that there was a lack of justification in the use of process, parties could avoid their obligation of establishing the dispositional element in a malicious prosecution claim by simply alleging a claim for abuse of process.[12] This dispositional requirement furthers the interests of finality and judicial economy. As this court explained in *Wilcox,* "To allow a defendant who has lost his case to sue the plaintiff for damages on the ground that the plaintiff's claim was false and malicious would give him his day in court a second time with no good result to our system of administering justice in courts of law." 16 Haw. at 43.

The risk of negating the dispositional requirement of a malicious prosecution claim by adopting the lack-of-justification standard in an abuse of process claim is not presented by the facts of this case, because Young was the *plaintiff* in the underlying action and could not file a malicious prosecution claim based on the Defendants' allegedly improper defenses. Nevertheless, that risk is inherent in the lack-of-justification standard and would surely surface in future claims advanced by parties who are plaintiffs in the predicate action. *See Kollodge v. State,* 757 P.2d 1024, 1027–28 (Alaska 1988) (observing that the only act of the defendant's that the plaintiffs had alleged in their abuse of process claim was the filing of the complaint

128 P.3d at 842 (quoting *Wong,* 7 Haw.App. at 420, 772 P.2d at 699–700; *Myers v. Cohen,* 5 Haw.App. 232, 687 P.2d 6 (1984), *rev'd on other grounds by* 67 Haw. 389, 688 P.2d 1145 (1984)); *Myers,* 5 Haw.App. at 242, 687 P.2d at 14 (quoting William L. Prosser, *Law of Torts* 857 (4th ed.1971)).

12. To illustrate, let us assume that a plaintiff maliciously files a complaint alleging a groundless claim for the improper purpose of harassing and intimidating the defendant. Such a complaint would clearly not be filed for the justifiable purpose of advancing the plaintiff's legitimate interests. *Cf. Nienstedt,* 651 P.2d at 879–80, 882; *Givens,* 75 S.W.3d at 402–03. The plaintiff would therefore be subject to liability for abuse of process by virtue of his lack of justification. Yet he would not necessarily be liable for malicious prosecution, with respect to which losing his case is a prerequisite. *See Wong,* 111 Hawai'i at 478, 143 P.3d at 17.

with an improper purpose); *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.*, 42 Cal.3d 1157, 232 Cal.Rptr. 567, 728 P.2d 1202, 1210 (1986) (explaining that the gist of the plaintiff's abuse of process claim was that the defendants improperly instituted a proceeding against the plaintiff). We therefore decline to follow the lack-of-justification standard and instead hold that, in order to establish an abuse of process claim, the plaintiff must prove a "willful act" distinct from the use of process *per se.*

In the present matter, Young's first amended complaint alleged that the Defendants sought to further an improper purpose when they employed the legal processes of filing an answer, appealing the arbitration award and taking the dispute to trial, making a HRCP Rule 68 offer of judgment, and opposing Young's requests for attorneys' fees, costs, and prejudgment interest. In our view, the Defendants' use of such processes, without more, did not constitute "willful" acts that were, in themselves, antithetical to the legitimate conduct of the underlying case. *See Tellefsen v. Key Sys. Transit Lines*, 198 Cal.App.2d 611, 615, 17 Cal.Rptr. 919, 922 (1961) ("[M]erely taking a frivolous appeal is not enough to constitute an abuse of process.... There is no allegation of any act of defendant using such appeal for other than its proper purpose."); *Coleman*, 226 Cal.Rptr. 90, 718 P.2d at 82 (following *Tellefsen* and holding that the defendant's "filing a meritless appeal" did not show that the defendant's "use of process was done in an unauthorized manner, but only that [its] motive was improper"); *Hawkins v. Webster*, 78 N.C.App. 589, 337 S.E.2d 682, 685 (1985) (holding that the defendant's filing of "answers, which contained falsehoods," was "not the type of improper act upon which a proper claim of abuse of process may be founded").

To summarize, although the first amended complaint sufficiently alleged that the Defendants employed processes and that their primary purpose in utilizing those processes was improper, it did not show that the Defendants committed a willful act not proper in the regular conduct of the underlying case. Accordingly, we hold that the circuit court correctly dismissed Young's abuse of process claim.

**B. The Circuit Court Did Not Err In Dismissing Young's Claim For Malicious Defense.**

In Young's second point of error, she argues that the circuit court erred by dismissing her malicious defense claim where this tort "is merely the counterpart of the well-established malicious prosecution cause of action." (Internal quotation marks omitted.) Young asserts that the circuit court should have deemed cognizable the claim of malicious defense "to protect the integrity of the judicial process, to deal with dishonest and unethical behavior, and to discourage misuse and abuse of limited judicial resources." (Internal quotation marks and citation omitted.)

■ This jurisdiction has not previously recognized a malicious defense claim, and we decline to do so now. We do not believe that recognizing the tort of malicious defense is necessary where (1) the threat of subsequent litigation will have a chilling effect on a party's legitimate defenses, and (2) existing rules and tort law compensate plaintiffs for the harm that they suffer when defendants' litigation tactics are brought in bad faith. Moreover, it is not appropriate to derive the tort of malicious defense from the tort of malicious prosecution where the tort of malicious prosecution remedies harms resulting from the *initiation* of a lawsuit. Accordingly, we affirm the circuit court's order dismissing Young's malicious defense claim.

*1. "borrowing" elements from the tort of malicious prosecution*

Although the torts of abuse of process and malicious prosecution are well established, the malicious defense tort is "unfamiliar, if known at all." Jonathan K. Van Patten & Robert E. Willard, *The Limits of Advocacy: A Proposal for the Tort of Malicious Defense in Civil Litigation*, 35 Hastings L.J. 891, 893 (1984) ["Van Patten & Willard, *The Limits of Advocacy* "]. In fact, only one court-the Supreme Court of New Hampshire-has recognized the tort of malicious defense. *See Aranson v. Schroeder*, 140 N.H. 359, 671 A.2d 1023, 1028–29 (1995).

*Aranson* adopted the following standard, claiming that the elements of the tort of malicious defense "essentially mirror those required to prove the tort of malicious prosecution":

One who takes an active part in the initiation, continuation, or procurement of the defense of a civil proceeding is subject to liability for all harm proximately caused, including reasonable attorneys' fees, if

(a) he or she acts without probable cause, i.e., without any credible basis in fact and such action is not warranted by existing law or established equitable principles or a good faith argument for the extension, modification, or reversal of existing law,

(b) with knowledge or notice of the lack of merit in such actions,

(c) primarily for a purpose other than that of securing the proper adjudication of the claim and defense thereto, such as to harass, annoy or injure, or to cause unnecessary delay or needless increase in the cost of litigation,

(d) the previous proceedings are terminated in favor of the party bringing the malicious defense action, and

(e) injury or damage is sustained.

671 A.2d at 1028–29 (quoting Van Patten & Willard, *The Limits of Advocacy*, 35 Hastings L.J. at 891, 933–934) (formatting altered). The New Hampshire Supreme Court reasoned that, just as a prevailing defendant may assert a malicious prosecution claim, a successful plaintiff should recover costs incurred as a result of trial because it prevailed "at a price—in time, money, and uncertainty—that was substantially exacerbated by the alleged actions of [defendant]." *Id.* at 1028. Here, relying solely on *Aranson*, Young argues that this court should adopt the tort of malicious defense. As Justice Thayer argued in his dissent in *Aranson*, however, the malicious defense tort is distinguishable from the malicious prosecution tort and thus should not be available to plaintiffs. *Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting).

2. *examining the tort of malicious prosecution*

■ Inasmuch as the tort of malicious defense is derived from the tort of malicious prosecution, it is necessary to elaborate on the well-established tort of malicious prosecution. The tort of malicious prosecution permits a plaintiff to recover when the plaintiff shows that the prior proceedings were (1) terminated in the plaintiff's favor, (2) initiated without probable cause, and (3) initiated with malice. *Brodie v. Hawai'i Auto. Retail Gasoline Dealers Ass'n, Inc.*, 2 Haw.App. 316, 318, 631 P.2d 600, 602 (1981), *rev'd on other grounds*, 65 Haw. 598, 655 P.2d 863 (1982) (citing Prosser, *Law of Torts* § 120, at 850–56); *Wong*, 111 Hawai'i 462, 478, 143 P.3d 1, 17 (2006) (citing *Reed v. City and County of Honolulu*, 76 Hawai'i 219, 230, 873 P.2d 98, 109 (1994)).

■ Because a malicious prosecution claim is triggered when the unsuccessful party initiated the lawsuit, "[t]he defendant is not liable for proceedings unless he has initiated them." *Prosser and Keeton on Torts* § 120, at 893; *Wilkinson v. Shoney's, Inc.*, 269 Kan. 194, 4 P.3d 1149, 1158–59 (2000) ("None of the examples in the comments to [Restatement (Second) of Torts ("Restatement") § 674 (1977), regarding "Wrongful use of Civil Proceedings,"] involve liability attaching to one who defends in an action without asserting a counterclaim or cross-claim."); *see also* concurring and dissenting opinion ("Dissent") at 430, 198 P.3d at 693. *Prosser and Keeton on Torts* further discussed the extent of a defendant's right to a malicious prosecution claim, as follows:

[T]he mere assertion of an affirmative defense is not initiation of a claim, so long as the defendant does not go further and demand damages or other relief. A bad faith defense, however, may subject the defendant to liability for attorneys' fees even when no statute so provides and this may serve to accomplish most of the purposes of a malicious prosecution action.

*Id.* (Footnotes omitted.)

■ The distinction between a plaintiff and defendant's right to claim malicious prosecution appears designed to address the

harms inflicted upon a party when a plaintiff initiated a lawsuit against it with malice and without probable cause. The tort of malicious prosecution protects "[t]he interest in freedom from unjustifiable litigation." *Prosser and Keeton on Torts*, § 119, at 870. The tort serves to compensate a party sued in a malicious and meritless legal action for his or her financial costs, as well as "psychic damage from the shock of the unfounded allegations in the pleadings[ ] and . . . the loss of his reputation in the community as a result of the filing and notoriety of the base allegations in the pleadings which are public records." *Stanley v. Superior Court*, 130 Cal. App.3d 460, 468, 181 Cal.Rptr. 878, 882 (1982) (citing *Bertero v. Nat'l Gen. Corp.*, 13 Cal.3d 43, 50–51, 529 P.2d 608, 614, 181 Cal.Rptr. 184, 190 (1974); *see also Hewitt v. Rice*, 119 P.3d 541, 544 (Colo.Ct.App.2004) ("The purpose of an action for malicious prosecution is to compensate a person sued in a malicious and baseless legal action for attorney fees, costs, psychic damage, and loss of reputation.")). As the party "haled into court" in a meritless and malicious suit, "the plaintiff's interests have been invaded, the plaintiff's reputation has suffered, and the plaintiff has been put to the expense of defense." *Prosser and Keeton on Torts*, § 119, at 871. Specifically, "wrongful civil suits can destroy a livelihood, devastate a business, or chill debate on public issues." Dan B. Dobbs, *The Law of Torts*, § 436, at 1228 (2001); *see also Bertero*, 13 Cal.3d at 50–51, 529 P.2d at 614, 118 Cal.Rptr. at 190 ("The individual is harmed because he is compelled to defend against a fabricated claim which not only subjects him to the panoply of psychological pressures most civil defendants suffer, but also to the additional stress of attempting to resist a suit commenced out of spite or ill will, often magnified by slanderous allegations in the pleadings."); *White v. Frank*, 855 F.2d 956, 960 n. 3 (2nd Cir.1988) (noting that the tort of malicious prosecution "provides redress, though only under tightly guarded circumstances, from unjustifiable litigation in order to protect the plaintiff's financial interests and interest in bodily freedom, as well as his reputation." (citing Fowler V. Harper, *Malicious Prosecution, False Imprisonment and Defamation*, 15 Tex. L.Rev. 157, 168–70 (1937))); *cf. Ellis v. Harland Bartholomew and Assocs.*, 1 Haw.App. 420, 428, 620 P.2d 744, 750 (1980) (observing, in the context of the dismissal of a civil proceeding, that "[s]omewhere along the line, the rights of the defendant to be free from costly and harassing litigation must be considered. So too must the time and energies of our courts and the rights of would be litigants awaiting their turns to have other matters resolved." (quoting *Von Poppenheim v. Portland Boxing and Wrestling Comm'n*, 442 F.2d 1047, 1054 (9th Cir.1971))).

The tort of malicious prosecution acknowledges the special, particular harms that a defendant suffers when a lawsuit is maliciously initiated against it. By concluding that a plaintiff and defendant may suffer from the same harms as a result of "groundless claims," *see* dissent at 433, 198 P.3d at 696, the dissent ignores the requirement that the lawsuit was initiated against the defendant and trivializes the harms that the plaintiff inflicts onto the defendant by initiating a baseless lawsuit.

### 3. *Possible consequences from recognizing the tort of malicious defense*

As stated above, only one jurisdiction has recognized the tort of malicious defense.[13] *See Aranson*, 671 A.2d at 1033 (Thayer, J., dissenting) (citations omitted); *California Physicians' Serv. v. Superior Court*, 9 Cal. App.4th 1321, 1325, 12 Cal.Rptr.2d 95, 96 (1992) ("Broadly but nevertheless accurately speaking, there is no tort of 'malicious defense.'" (citing *Bertero*, 13 Cal.3d at 52, 529

---

13. The dissent heavily quotes *Fergerstrom v. Hawaiian Ocean View Estates*, 50 Haw. 374, 375 n. 1, 441 P.2d 141, 143 n. 1 (1968), for this court's willingness to recognize a new cause of action. *See* dissenting opinion at 435–36, 198 P.3d at 698–99. In considering whether to recognize a claim of invasion of privacy, however, we noted: "We are disinclined to decide an important issue merely on the basis of the number of states adopting a given approach. But *some weight must be accorded to the overwhelming recognition of a common law right of privacy by all but a few states.*" *Fergerstrom*, 50 Haw. at 375 n. 1, 441 P.2d at 143 n. 1 (emphasis added). Thus, we observed that "[b]etween 1941 and 1964, the number of states recognizing a cause of action for invasion of privacy increased from 8 to 31." *Id.*

P.2d at 615, 118 Cal.Rptr. at 191)); *Wilkinson*, 4 P.3d 1149 (declining to adopt or recognize the tort of malicious defense in spite of *Aranson*, and concluding that if "such is deemed desirable or needed, action by the legislature is required," "especially ... in light of [the court's] long-standing recognition of the law to the contrary"); *Baxter v. Brown*, 83 Kan. 302, 111 P. 430, 431 (1910) (noting that the tort of malicious prosecution is recognized, but that the court has "failed, however, to find any authority for assessing damages for a malicious defense of an action"); *cf. Levinson v. Citizens Nat'l Bank of Evansville*, 644 N.E.2d 1264, 1268 (Ind.Ct. App.1994) (holding that parties to a lawsuit do not owe each other a duty to refrain from causing a mistrial, and observing that "[t]rying a case is often a mental as well as physical challenge requiring attention to every detail. The parties should not have the additional burden of worrying whether an improper question or answer or some other event will inspire another round of litigation"); *Wong v. Tabor*, 422 N.E.2d 1279, 1283 (Ind.Ct.App.1981) ("The tort of malicious prosecution is not generally favored in our legal system, and thus its requirements are construed strictly against the party bringing the action."). Based on the following consequences of the recognition of this tort, we believe it is appropriate to join the majority of courts that have addressed this issue and decided not to recognize the tort of malicious defense.

### a. chilling effect

In declining to recognize the tort of malicious defense, we note that the malicious defense standard is not parallel to the three-part standard this jurisdiction follows for the tort of malicious prosecution.

To sustain a claim for malicious prosecution, a plaintiff must show that the defendant initiated the prior lawsuit with malice, which this court has defined as "[t]he intent, without justification or excuse, to commit a wrongful act[,]" "reckless disregard of the law or of a person's legal rights[,]" and "[i]ll will; wickedness of heart." *Awakuni v. Awana*, 115 Hawai'i 126, 141, 165 P.3d 1027, 1042 (2007) (quoting Black's Law Dictionary 976 (8th ed.2004)). "[T]he emphasis is upon the misuse of criminal—and sometimes civil—actions as a means for causing harm." *Prosser and Keeton on Torts*, § 119, at 870. Young and the dissent propose a standard for the tort of malicious defense that is less strict, however, inasmuch as the tort imposes liability where the defendant acted "primarily for a purpose other than that of securing the proper adjudication of the claim and defense thereto, such as to harass, annoy or injure, or to cause unnecessary delay or needless increase in the cost of litigation." *See supra*. We recognize that a defendant that knowingly acted without probable cause "primarily" to "annoy" the plaintiff was not merely exerting its right to conduct a vigorous defense and may be sanctioned under Hawaii's civil rules of procedure. We do not condone such defense practices. Still, we cannot take the drastic step of creating a new tort, inasmuch as the tort of malicious defense will have a chilling effect on legitimate defenses, particularly because it softens the malice standard of the tort of malicious prosecution. *See* Lee Craig, *Malicious Defense*, 13 Mealey's Litigation Report: Insurance Bad Faith 25 (Dec. 21, 1999), *available at* http://butlerpappas.com/showarticle.aspx?Ref=list&Show=522.

As the party "haled into court," the defendant has the right to vigorously defend itself against the plaintiff's claims. "[V]igorous and zealous advocacy is a necessary component of our judicial system." *Office of Disciplinary Counsel v. Breiner*, 89 Hawai'i 167, 171, 969 P.2d 1285, 1289 (1999); *see also In re Attorney's Fees of Mohr*, 97 Hawai'i 1, 7, 32 P.3d 647, 653 (2001) (adopting the policy of requiring counsel to remain an advocate for the client and declining to impose sanctions on court-appointed attorneys so long as their arguments on appeal reflect zealous advocacy on behalf of their clients); Preamble, *Hawai'i Rules of Professional Conduct*, [2] ("As a representative of clients, a lawyer performs various functions.... As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system."). The creation of the tort of malicious defense and recognizing potential liability for defendants would jeopardize this important right: the tort may "have a chilling effect on

some legitimate defense and perhaps drive a wedge between defendants seeking zealous advocacy and defense attorneys who fear personal liability in a second action." *Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting). The risk of compromising a defendant's right to "vigorous and zealous advocacy" by virtue of the threat of a subsequent lawsuit appears too great to justify the recognition of the tort of malicious defense. *See infra.*

In the context of the litigation privilege, we addressed the consequences of the threat of liability in subsequent lawsuits:

> [L]iability in subsequent proceedings tends to discourage parties from turning to the courts where an irreconcilable conflict exists. In this manner, the chilling effect resulting from the threat of subsequent litigation hinders access to the courts, which undermines the courts' role in resolving disputes and vindicating rights. Given the importance of access to the courts, the policy of avoiding the chilling effect resulting from the threat of subsequent litigation generally favors limiting liability in subsequent proceedings.

*Matsuura v. E.I. du Pont de Nemours and Co.*, 102 Hawai'i 149, 157, 73 P.3d 687, 695 (2003). *Cf. Prosser and Keeton on Torts*, § 120, at 889–90 (observing that malicious prosecution claims have a chilling effect on honest litigants); *Laing v. Shanberg*, 13 F.Supp.2d 1186, 1189 (D.Kan.1998) ("[M]alicious prosecution causes of action have long been disfavored in the law because they tend to discourage individuals from seeking redress in the courts."); *Dickinson v. Echols*, 578 So.2d 1257, 1258 (Ala.1991) (explaining that " '[p]ublic policy requires that all persons shall [be able to] resort freely to the courts for redress of wrongs and to enforce their rights, and that this may be done without the peril of a suit for damages in the event of an unfavorable judgment by jury or judge' "); *Paul v. Nat'l Educ. Ass'n*, 189 N.J.Super. 265, 459 A.2d 1213, 1214 (1983) (noting that malicious prosecution suits tend to chill free access to the courts). Thus, in our view, recognizing the derivative tort of malicious defense is not justified because it would result in chilling *legitimate defenses.*

### b.  respecting the defendant's rights

Deriving the tort of malicious defense from the tort of malicious prosecution would plainly ignore a defendant's legal position and rights. A successful defendant, "involuntarily haled into court" without probable cause and with malice, seeks to recover compensation for defending itself against malicious and meritless claims. On the other hand, a plaintiff that prevailed in the initial lawsuit seeks damages for malicious defenses that were raised "merely to resist the claim of a plaintiff already before the court." *Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting).

*Ritter v. Ritter*, 381 Ill. 549, 46 N.E.2d 41 (1943), which held that a successful plaintiff is not entitled to recover attorneys fees and expenses against the unsuccessful defendant in a second action without statutory authorization, illustrated why permitting a plaintiff to bring a second lawsuit against an unsuccessful defendant is problematic. When a plaintiff's claim succeeds, that usually means that the defendant engaged in wrongful conduct:

> If the plaintiff is successful in the suit, the probability is that the conduct of the defendant causing the suit was wrongful. When a defendant breaches a lease, violates the terms of a contract, commits a tort, misrepresents goods sold, unlawfully retains the personal property of the plaintiff, or remains in possession of real estate after the expiration of his tenancy, necessitating proceedings, his conduct is wrongful and may require a suit against him by the plaintiff.

*Id.* at 555, 46 N.E.2d at 44. Yet, "[t]he defendant ha[s] the right to resist [a plaintiff's] claim and if [the] plaintiff[ ] wished to establish [its] right it was necessary for [it] to resort to litigation." *Id.* at 554, 46 N.E.2d at 44. Based on the nature of the tort and the circumstances that often give rise to a claim for malicious defense, we cannot agree that it is appropriate to recognize this tort.

Furthermore, by initiating the lawsuit, the plaintiff must "be held to accept, to some degree, the costs and risks of litigation." *Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting); *see also Eastin v. Bank of Stockton*, 66 Cal. 123, 127, 4 P. 1106, 1109–10

(1884) ("The plaintiff sets the law in motion; if he does so groundlessly and maliciously, he is the cause of the defendant's damage. But the defendant stands only on his legal rights,—the plaintiff having taken his case to court, the defendant has the privilege of calling upon him to prove it to the satisfaction of the judge or jury, and he is guilty of no wrong in exercising this privilege." (citation and internal quotation marks omitted)). In rejecting the tort of malicious defense, Justice Thayer pointed out that in the tort of malicious prosecution, the defendant seeks damages for harms suffered directly because of the plaintiff's *initiation* of the lawsuit. *Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting). On the other hand, "[t]he plaintiff who encounters a malicious defense voluntarily entered the judicial system." *Id.* "When this plaintiff ultimately prevails in the action, at best only a *portion* of the plaintiff's litigation costs and damages can be attributed to the malicious defense." *Id.* (Emphasis added.)

Unfortunately, litigation "has a profound effect upon the quality of one's life that goes beyond the mere entitlement to counsel fees." *Aranson*, 671 A.2d at 1028; *see also* dissenting opinion at 432–33, 198 P.3d at 695–96. Nevertheless, remedying the plaintiff's harm suffered solely from the lawsuit *in a subsequent lawsuit* is outweighed by the chilling effect that the tort of malicious defense would have on legitimate defenses, particularly where the plaintiff's harms are compensated by existing rules and statutes.

### c. other criticisms of the tort of malicious defense

As Justice Thayer also recognized, a tort of malicious defense may threaten the rule that "an attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding." *Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting); *McCarthy v.*

*Yempuku*, 5 Haw.App. 45, 48–49, 678 P.2d 11, 14 (1984) (quoting Restatement § 586). "[T]he protection is complete *irrespective of the motive prompting the use of the words or writings,* but the privilege does not extend to matters having no materiality or pertinency to the question involved in the suit." *Ferry v. Carlsmith*, 23 Haw. 589, 591 (Terr.1917) (emphasis added). *See also* Restatement § 586 comment a ("[The absolute privilege] protects the attorney from liability in an action for defamation irrespective of his purpose in publishing the defamatory matter, his belief in its truth, or even his knowledge of its falsity."). In *Kahala Royal Corp.*, 113 Hawai'i at 268, 151 P.3d at 749, this court observed the following policies associated with the litigation privilege:

(1) promoting the candid, objective, and undistorted disclosure of evidence; (2) placing the burden of testing the evidence upon the litigants during trial; (3) avoiding the chilling effect resulting from the threat of subsequent litigation; (4) reinforcing the finality of judgments; (5) limiting collateral attacks upon judgments; (6) promoting zealous advocacy; (7) discouraging abusive litigation practices; and (8) encouraging settlement.

(Quoting *Matsuura v. E.I. du Pont de Nemours & Co.*, 102 Hawai'i 149, 155, 73 P.3d 687, 693 (2003)) (some citations, brackets, and internal quotation marks omitted). "Where the alleged misconduct consists in part of false statements made in the underlying proceedings, as in the instant case, allowing an action for malicious defense may counteract our stated polic[ies]." *Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting).

Additionally, recognizing the tort of malicious defense may result in plaintiffs seeking damages when (1) they are "dissatisfied with an award in the underlying suit" or (2) "the defendant in the underlying action is judgment-proof" and they attempt to extend "liability to attorneys, their firms, and possibly, third parties." *Id.* The California appeals court also expressed concerned that the tort of malicious defense would invite never-ending litigation:[14]

decision concerning the tort of malicious defense since it first handed down *Aranson*," and con-

**14.** The dissent observes that "the New Hampshire Supreme Court has yet to issue a single

The policy of the rule is obvious. If the wrongful conduct of a defendant causing the plaintiff to sue him would give rise to an independent tort and a separate cause of action, there would be no end to the litigation, for immediately upon the entry of judgment the plaintiff would start another action.... Under our jurisprudence the defendant may present any defense ... that he may have or that he may deem expedient, and in so doing he will not be subjecting himself to a second suit by the plaintiff based on the wrongful conduct of the defendant in causing the plaintiff to sue him or in defending the action. The rule is the same even though the wrongful conduct of the defendant is willful, intentional, malicious or fraudulent.

*California Physicians' Service*, 9 Cal.App.4th at 1325 n. 2, 12 Cal.Rptr.2d at 97 n. 2 (quoting *Ritter*, 46 N.E.2d at 44). In our view, it is simply unnecessary to risk the foregoing consequences that may arise from recognizing the tort of malicious defense when viable alternatives exist.

4. *Hawai'i Rules And Statutes Remedy A Defendant's Practice of Malicious Defenses Within The Initial Lawsuit.*

The Supreme Court of California has "cautioned against creating or expanding derivative tort remedies, at least when the underlying litigation provided adequate remedies," "to avoid 'an unending roundelay of litigation.'" *Brennan v. Tremco, Inc.*, 25 Cal.4th 310, 314, 20 P.3d 1086, 1088, 105 Cal.Rptr.2d 790, 793 (2001). In rejecting the plaintiff's claim that contractual arbitration would give rise to an action for malicious prosecution,

*Brennan* explained the "trend against creating or expanding derivative tort remedies":

Seeking to avoid "an unending roundelay of litigation" we have cautioned against creating or expanding derivative tort remedies, at least when the underlying litigation provided adequate remedies. "In the past, we have favored remedying litigation-related misconduct by sanctions imposed within the underlying lawsuit rather than by creating new derivative torts." For these reasons, we have said that the tort of malicious prosecution "should not be expanded." [*Crowley v. Katleman*, 8 Cal.4th 666, 680–81, 34 Cal.Rptr.2d 386, 392–93, 881 P.2d 1083, 1089–90 (1994).] "[T]he most promising remedy for excessive litigation does not lie in an expansion of malicious prosecution liability.... [I]n our view *the better means of addressing the problem of unjustified litigation is through the adoption of measures facilitating the speedy resolution of the initial lawsuit and authorizing the imposition of sanctions for frivolous or delaying conduct within that first action itself, rather than through an expansion of the opportunities for initiating one or more additional rounds of malicious prosecution litigation after the first action has been concluded.*" [*Sheldon Appeal Co. v. Albert & Oliker*, 47 Cal.3d 863, 873, 254 Cal.Rptr. 336, 341, 765 P.2d 498, 503 (1989)].[15]

*Id.* at 314–15, 20 P.3d at 1088–89, 105 Cal.Rptr.2d at 793 (some citations omitted) (emphasis and footnote added).

█ By rejecting the tort of malicious defense, we are by no means authorizing or

cludes that, "the tort does not appear to have spawned a single appeal in the state's courts, much less led to an inundation of malicious defense claims." Dissenting opinion at 435, 198 P.3d at 698. Although the dissent cites to the lack of appellate cases regarding this tort, it fails to cite to research disclosing the number of "malicious defense claims" in New Hampshire. *Id.*

15. In *Sheldon Appel Company*, the California Supreme Court observed that legal commentators have concluded that expanding the tort of malicious prosecution would not likely curb the problem of increased civil litigation. 47 Cal.3d at 873, 765 P.2d at 502, 254 Cal.Rptr. at 340–41. (Citing Mallen & Levit, *Legal Malpractice* § 48, at 101 (2d ed. 1981) ["[S]ound public policy

considerations dictate against lessening the requirements of the tort and against creating new remedies for one whose injury is attributable to having been named as a party in a lawsuit"]; Sheila L. Birnbaum, *Physicians Counterattack: Liability for Lawyers of Instituting Unjustified Medical Malpractice Actions*, 45 Fordham L.Rev. 1003, 1033 (1977) ("Any significant expansion of the tort of malicious prosecution would lead to interminable and vexatious litigation that should be avoided"); William C. Campbell, Note, *Groundless Litigation and the Malicious Prosecution Debate: A Historical Analysis*, 88 Yale L.J. 1218, 1234–1237 (1979) (proposing that malicious prosecution tort be replaced with compulsory counterclaim in underlying action)).

condoning malicious action on the part of a defendant. *See* dissenting opinion at 432–33, 198 P.3d at 695–96. In our view, however, such offenses are sufficiently deterred by Hawaii's rules and statutes that authorize the court to sanction the malicious defendant, *see* Hawai'i Rule of Civil Procedure ("HRCP") Rule 11; HAR Rule 26 (providing that a party that appeals an arbitration award and requests a trial *de novo*, but fails to improve the arbitration award by 30% or more may be assessed sanctions);[16] HRS § 636–16 (authorizing a trial court to award interest for civil case awards, commencing on the date that the injury first occurred as a result of tortious conduct, and on the date of the breach in cases of breach of contract),[17] and the tort of IIED, *see infra.* Accordingly, the tort of malicious defense is unnecessary.[18]

HRCP Rule 11(b),[19] for example, sanctions parties that make presentations to the court "for an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation." HRPC Rule 11 is strikingly similar to the proposed malice element of the tort of malicious defense. *See* dissenting opinion at 430, 198 P.3d at 693 ("One who takes an active part in the initiation, continuation, or procurement of the defense of a civil proceeding is subject to liability ... if ... he or she acts ... primarily for a purpose other than that of securing the proper adjudication of the claim and defense thereto, such as to harass, annoy or injure, or to cause unnecessary delay or needles increase in the cost of litigation."). Violations of HRCP Rule 11(b) may result in a sanction "to deter repetition of such conduct or comparable conduct by others similarly situated," such as nonmonetary sanctions, an order to pay a penalty into court, or an order to pay reasonable attorneys' fees and other expenses incurred as a direct result of the violation.[20] HRCP Rule 11(c)(2).

16. HAR Rule 26 is designed to discourage "incurring further costs and expenses of trial" through "baseless or frivolous appeals from an arbitration decision ... because they prevent prompt and equitable resolutions of actions." *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 511, 880 P.2d 169, 186 (1994).

17. As this court set forth in *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.,* 74 Haw. 85, 137, 839 P.2d 10, 36, *reconsideration denied* 74 Haw. 650, 843 P.2d 144 (1992), "[t]he purpose of [HRS § 636–16] ... is to allow the court to designate the commencement date of interest in order *to correct injustice when a judgment is delayed for a long period of time for any reason, including litigation delays."* (quoting *Schmidt v. Bd. of Dirs. of Ass'n of Apartment Owners of Marco Polo Apartments,* 73 Haw. 526, 534, 836 P.2d 479, 483 (1992) (internal quotations, quotation marks, and brackets omitted) (emphasis added)). *See also Wiegand v. Colbert,* 68 Haw. 472, 478, 718 P.2d 1080, 1084 (1986) ("[T]he legislative history shows [that] the purposes of the statute[, *i.e.,* HRS § 636–16,] were to permit more equitable results and to more speedily resolve cases."); Sen. Conf. Comm. Rep. No. 67, in 1979 Senate Journal, at 984 ("Where the issuance of a judgment is greatly delayed for any reason, such fixed commencement date can result in substantial injustice. Allowing the trial judge to designate the commencement date will permit more equitable results. Also, it is expected that party litigants will give serious regard to this discretion on the part of the trial judge so that *those who may have had an unfair leverage* by the arbitrariness of the prior rule will arrive at the realization that *recalcitrance or unwarranted delays in cases which should be more speedily resolved will not*

*enhance their position or assure them of a favorable reward."*) (emphases added).

18. We note that, in the underlying case, under HAR Rule 26, Young, the prevailing party who did not appeal the arbitration, was awarded attorneys' fees of $15,000 and costs of $8,374.89. Young also was awarded $35,090.03 in prejudgment interest under HRS § 636–16.

19. HRCP Rule 11(b) provides:

(b) Representations to court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

In addition, under HRS § 603–21.9 (1993),[21] "Hawai'i circuit courts have the inherent power and authority to control the litigation process before them and 'to curb abuses and promote fair process[,] . . . including[, for example,] the power to impose sanctions . . . for 'abusive litigation practices.'" *Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999) (quoting *Enos v. Pac. Transfer & Warehouse, Inc.*, 79 Hawai'i 452, 458, 903 P.2d 1273, 1279 (1995)).

The Hawai'i Rules of Professional Conduct ("HRPC") also serve to protect parties from malicious conduct by opposing party's counsel. The HRPC prohibits a lawyer from "defend[ing] a proceeding, or assert[ing] or controvert[ing] an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification, or reversal of existing law." HRPC Rule 3.1. Although the rules "are not designed to be a basis for civil liability," an attorney's "[f]ailure to comply with an obligation or prohibition imposed by a rule is a basis for invoking the disciplinary process." Preamble, *Hawai'i Rules of Professional Conduct*, [5], [6].

The dissent contends that the foregoing rules and statutes do not "provide a complete remedy for the potential damages that malicious defenses inflict." Dissenting opinion at 432–33, 198 P.3d at 695–96. In our view, however, these rules and statutes, together with the tort of IIED, protect against a defendant raising malicious defenses. *See Aranson*, 671 A.2d at 1032 (Thayer, J., dissenting) (observing that when a party has acted unreasonably and in bad faith, the court has the power to impose sanctions which "will usually compensate a plaintiff for all or most of the damage resulting from a malicious defense"); *Prosser and Keeton on Torts*, § 120, at 893 ("A bad faith defense . . . may subject the defendant to liability for attorneys' fees even when no statute so provides and this may serve to accomplish most of the purposes of a malicious prosecution action."). Permitting a plaintiff to bring a second lawsuit against the same party as the underlying case where other workable remedies exist may allow such plaintiff to recover twice against the defendant and needlessly burden the already overworked judicial system. *Cf. Dorrance v. Lee*, 90 Hawai'i 143, 147, 976 P.2d 904, 908 (1999) ("[W]ith the increase of civil litigation, escalating costs to the parties, and the strain on already scarce judicial resources, there is a dire need for prompt, equitable, and cost-efficient resolution of civil disputes before trial.").

### 5. Seeking Punitive Damages Through An IIED Claim

In certain cases, a plaintiff aggrieved by the defendant's assertion of malicious defenses is entitled to recover compensatory and punitive damages through an IIED claim. *Cf. Lee v. Aiu*, 85 Hawai'i 19, 34, 936 P.2d 655, 670 (1997) (affirming the jury's award of punitive damages where it was reasonable for the jury to have found the defendant

---

20. Based on the similarities between HRCP Rule 11 and the tort of malicious defense, we note Rule 11's criticisms. "Excessive [HRCP] Rule 11 litigation would likely pose a very real threat to the resources and integrity of a state's judicial system." Eric K. Yamamoto, Danielle K. Hart, *Rule 11 and State Courts: Panacea or Pandora's Box?*, 13 U. Haw. L.Rev. 57, 100 (1991). Furthermore, the rule also creates a chilling effect:

> First, the rule, it is argued, inhibits vigorous and creative lawyering, thereby stifling the development of the common law; and second, the rule poses special threats to small plaintiffs' attorneys and to public interest and pro bono attorneys, thereby inhibiting court access for certain social groups, especially those asserting novel legal theories or reordered social understandings in the form of legal rights.

*Id.* (citing Eric K. Yamamoto, *Efficiency's Threat to the Value of Accessible Courts for Minorities*, 25 Harv. C.R.–C.L.L.Rev. 341, 351–52, 362 (1990)). We believe that these risks increase when a plaintiff is entitled to pursue a claim for malicious defense in an *independent, subsequent lawsuit*.

21. HRS § 603–21.9 provides in relevant part:
    The several circuit courts shall have power:
    . . .
    (6) To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

liable for IIED). An award of punitive damages may serve to "punish a defendant for 'aggravated or outrageous misconduct' and to deter that defendant from similar conduct in the future." *Lee,* 85 Hawai'i at 34, 936 P.2d at 670; *see also Zanakis–Pico v. Cutter Dodge, Inc.,* 98 Hawai'i 309, 331 n. 4, 47 P.3d 1222, 1244 n. 4 (2002) (nominal damages may be the basis of an award of punitive damages in intentional torts, because "the jury may award nominal damages to acknowledge that the cause of action was established and punitive damages to punish the wrongdoer for violating the rights of the victim" (quoting *Sanchez v. Clayton,* 117 N.M. 761, 877 P.2d 567, 573 (1994))).

This court has stated that a plaintiff may assert an IIED claim by establishing "(1) that the conduct allegedly causing the harm was intentional or reckless; (2) that the conduct was outrageous; and (3) that the conduct caused (4) extreme emotional distress to another." *Brooks v. Dana Nance & Co.,* 113 Hawai'i 406, 415, 153 P.3d 1091, 1100 (2007) (quoting *Hac,* 102 Hawai'i 92, 95, 73 P.3d 46, 49 (2003)). The tort of IIED is well-accepted. *See id.;* Restatement § 46; *Prosser and Keeton on Torts,* § 12, at 54–66. Still, this tort "provides no clear definition of the prohibited [outrageous] conduct." Daniel Givelber, *The Right To Minimum Social Decency And the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct,* 82 Colum. L.Rev. 42, 51 (1982). The Restatement simply informs us that a defendant's conduct satisfies the element where "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement § 46 comment d.

Our understanding of this tort is thus guided by the Restatement's other comments: actors are not liable for "mere insults, indig-nities, threats, annoyances, petty oppressions, or other trivialities." *Id.; see also Prosser and Keeton on Torts,* § 12, at 59. An actor is also not liable where the conduct is "privileged,"—when "he has done no more than to insist upon his legal rights in a *permissible way,* even though he is well aware that such insistence is certain to cause emotional distress." Restatement § 46 comment g (emphasis added).

■ A plaintiff may, however, state a claim for IIED because of his or her relationship with the defendant. "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement § 46 comment e. "In this sense extreme 'bullying tactics' and other 'high pressure' methods of insurance adjusters seeking to force compromises or settlements" may satisfy the conduct element. *Eckenrode v. Life of America Ins. Co.,* 470 F.2d 1, 4 (7th Cir.1972) (citing Restatement § 46 comment e) ("Insurer's alleged bad faith refusal to make payment on the policy, coupled with its deliberate use of 'economic coercion' (*i.e.,* by delaying and refusing payment it increased plaintiff's financial distress thereby coercing her to compromise and settle) to force a settlement, clearly rises to the level of 'outrageous conduct' to a person of 'ordinary sensibilities.'"); *Prosser and Keeton on Torts,* § 12, at 62 (noting that plaintiffs may assert an IIED claim to hold parties liable for engaging in "outrageous bullying tactics" intending "to force a settlement"); *see also Frishett v. State Farm Mutual Auto. Ins. Co.,* 3 Mich.App. 688, 143 N.W.2d 612 (1966).[22] In fact, cases involving parties inappropriately resolving their liability disputes actually helped define and develop IIED:

22. In *Frishett,* a plaintiff sought damages for her mental suffering caused by the insurer defendant's intentional acts. 143 N.W.2d at 612. The plaintiff alleged that her husband was killed and her daughter was severely injured when the automobile they were in collided with another vehicle. *Id.* The defendant, which was the insurance carrier for both vehicles, made false statements, unjustly withheld medical payments, and obtained the family's private information for its use as the insurance carrier for the other insured vehicle. *Id.* The defendant's conduct caused the plaintiff to become distressed and emotionally suffer. *Id.* The trial court granted the defendant a summary judgment, ruling that the plaintiff may not seek damages without alleging that she sustained a physical injury. *Id.* On appeal, however, the *Frishett* court reversed, holding that the plaintiff's complaint sufficiently stated a cause of action for IIED. *Id.* at 692–93, 143 N.W.2d 612.

One of the most prominent lines of cases in the evolution of IIED arose from the development of the modern credit and insurance industries. Specifically, the pressure tactics of humiliating debtors into repayment and intimidating claimants into accepting low compensation for insured losses became a fertile source of abusive behavior that had no home in the community of recognized torts. Some collection cases involved conduct readily assignable to established tort categories like defamation and assault, but in others the courts either lacked these options or chose to identify the infliction of emotional distress as the predicate for recovery. It has been suggested that the courts in these cases were especially willing to compensate plaintiffs for purely emotional injuries because the abusive treatment was a deliberate and premeditated element of a commercial strategy. The claims adjustment cases presented courts with the compelling scenario of a powerful insurance company bullying a physically infirm and/or financially vulnerable victim. In recent years, the existence of a special relationship, particularly one of authority or economic dependence, between the plaintiff and defendant often has been an important factor in rendering liability for IIED.

Russell Fraker, *Reformulating Outrage: A Critical Analysis of the Problematic Tort of IIED*, 61 Vand. L.Rev. 983, 990–91 (2008) (footnotes omitted).

■ In the same way, a plaintiff may assert a claim for IIED for suffering from the defendant's conduct during a prior lawsuit. A party is not liable for merely "insist[ing] upon his legal rights in a permissible way," Restatement § 46 comment g, but it may be liable for its conduct in the prior litigation that is not justifiable. In other words, the elements of IIED—though narrower and more refined than that of the tort of malicious defense—do not preclude a successful plaintiff from seeking damages for suffering from a third party's conduct in a previous lawsuit.

To illustrate, in this case, we are concluding that Young stated a claim for IIED based upon, among other things, the Defendants' conduct during the litigation. *See infra.* We are holding that "reasonable people could differ as to whether the Defendants acted without just cause or excuse and beyond all bounds of decency in [this case]." *See id.* As part of Allstate's litigation tactics, Allstate offered Young merely $5,000 to settle her claims, then raised its offer to $5,300, even though it was aware that its insured was liable for the accident and that her medical expenses from the accident exceeded this offer. Additionally, we "believe that the complaint plainly alleged [the first, third, and fourth element of IIED] by averring that the Defendants' intentional conduct caused Young to experience severe anxiety, worry, fear, and mental and emotional distress." *See also Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (1970) (affirming the $250,000 judgment against the defendants, an insurance company and its claims supervisor, where defendants refused to make payments under the insured's policy and acted for the purpose of causing the plaintiff to settle a nonexistent dispute). Consistent with the tort of IIED, a defendant should be held liable for a subsequent lawsuit if he or she engaged in outrageous conduct, causing the plaintiff distress.

We believe it is more appropriate to sanction other, less offensive litigation conduct within the same, underlying lawsuit, or, where it is necessary, to offer relief based on the well-established tort of IIED. *See* Restatement § 46 comment d (noting that actors are not liable for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"). In our view, Hawaii's existing rules, statutes, and tort law offer appropriate remedies for the plaintiff's injuries.

In light of the plethora of remedies available to plaintiffs when defendants' litigation tactics are brought in bad faith, and because we should not chill the defendants' right "to conduct a vigorous defense," we decline to adopt the tort of malicious defense.[23]

23. Young urges this court to consider the special circumstances of an insurance company as a defendant when ruling on the adoption of a malicious defense claim. Young alleges:

## C. The Circuit Court Correctly Dismissed Young's Claim For Breach of The Assumed Duty of Good Faith and Fair Dealing.

█ In Young's third point of error, she asserts that the circuit court erred by dismissing her claim that Allstate breached its "assumed" duty of good faith and fair dealing. OB at 27–30. Young alleges that she was in a contractual relationship with Allstate based on (1) the pledge promising to make an "appropriate offer of compensation," (2) Allstate's claim representative stating that she did not need an attorney because Allstate would provide her quality service on her claim and treat her fairly, and (3) her failure to seek legal assistance because of Allstate's representations.[24] She asserts that, as a result of this contract, Allstate had a duty of good faith and fair dealing towards her.

We have explained that "every contract contains an implied covenant of good faith and fair dealing that neither party will do anything that will deprive the other of the benefits of the agreement." *Best Place*, 82 Hawai'i at 123–24, 920 P.2d at 337–38; *see also* Restatement (Second) Contracts § 205 (1979) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.").[25] Defendants, however, contend that Allstate did not have a contractual relationship with Young inasmuch as the elements of offer, acceptance, and adequate consideration were not present. Accordingly, they assert that they did not assume a duty of good faith and fair dealing towards her and that the circuit court properly dismissed this claim. Because Young fails to demonstrate that she gave Allstate consideration or that she detrimentally relied on Allstate's promise to settle her claim, we agree that Defendants did not owe to Young a duty of good faith and fair dealing.

█ One of the preconditions to the creation of a contract is consideration. *Douglass v. Pflueger Haw., Inc.*, 110 Hawai'i 520, 534, 135 P.3d 129, 143 (2006). "Consid-

> If claimants are uniformly forced to file lawsuits against Allstate, which is statutorily barred bound to provide timely payments, with Allstate intending to then punish claimants with harassing tactics, delay and imposition of legal expenses, it is difficult to conclude that the claimant assumed the 'risk' of this behavior. [Young] was forced to file a lawsuit against Allstate because of its refusal to pay a fair amount after promising in writing it would do so. Allstate's defense becomes malicious rather than merely vigorous when the whole approach to litigation is to use it as a club to punish [Young] and other claimants who hire attorneys and dare to present bodily injury claims and request fair payment.

Young also posits that "the law remains relevant and appropriate to the changing realities of modern society. This is especially true when institutional behemoths like Allstate with vast resources are engaged in purposeful predatory behavior against which the ordinary litigant is ill-equipped to struggle." The special circumstances presented in this case, however, shall not dictate the creation of a malicious defense claim that is not otherwise justified. We note that it is more appropriate for the legislature to create measures that prevent specific tactics where necessary or appropriate. *See Wilkinson*, 4 P.3d at 1158–59 (noting that the legislature should adopt a measure recognizing a malicious defense tort if needed).

24. On appeal, Young also asserts that Allstate promised to "make an appropriate offer of compensation for any [of her] injuries," treat her

fairly, and provide quality service on her claim and "told her that because of these promises she did not need an attorney." Allstate's alleged statement that "she did not need an attorney" may have been inappropriate and even resulted in her forgoing independent legal counsel, but, nevertheless, it did not signify that Allstate was making the promises as contractual consideration for Young's forbearance of legal counsel.

25. Young further alleges that under *Best Place*, 82 Hawai'i at 131, 920 P.2d at 345, tort recovery is available only when a trust based relationship exists that is permitted for breach of that duty, and that she had a special, trust-based relationship with Allstate. She bases this relationship on (1) the alleged contract, (2) Allstate's intention to establish a "trust-based relationship" with Young, and (3) the policy of handling claims fairly.

However, *Best Place* does not extend the duty to parties who had a "relationship" but not a contract; rather, it provided that "the *insurance contract* and the *relationship it creates* contain more than the company's bare promise to pay certain claims when forced to do so; implicit in the *contract and the relationship* is the insurer's obligation to play fairly with its insured." *Best Place*, 82 Hawai'i at 130, 920 P.2d at 344 (emphases added). Thus, this duty did not arise because the parties had a "trust relationship" with each other.

eration is defined as a bargained for exchange whereby the promisor receives some benefit or the promisee suffers a detriment." *Id.* (quoting *Shanghai Inv. Co., Inc. v. Alteka Co.*, 92 Hawai'i 482, 496, 993 P.2d 516, 530 (2000), *overruled on other grounds by Blair*, 96 Hawai'i 327, 31 P.3d 184). "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Restatement (Second) of Contracts* § 71(2) (1981). "The performance may consist of (a) an act other than a promise, or (b) a forbearance, or (c) the creation, modification, or destruction of a legal relation." *Id.* § 71(3) (spacing altered); *see also Shannon v. Waterhouse*, 58 Haw. 4, 6, 563 P.2d 391, 393 (1977).

In the present matter, Young asserts that, "in return for Allstate's representations in its pledges, [she] agreed to forbear the assistance of counsel for over a year." Young chooses her words carefully. Her argument implies that Allstate agreed to perform pursuant to the representations in its pledge "in return" for Young's forbearance from counsel. That is not, however, what she alleged in her first amended complaint. There, she asserted that, in her initial telephone conversation with an Allstate representative, the representative said that Allstate would provide quality service on her claim and treat hear fairly and that, "because of those promises, she did not need an attorney." Young did not allege that the representative stated that Allstate would provide quality service "in return for," "in exchange for," or "conditioned upon" Young's forbearance from counsel. *See Hipsky v. Allstate Ins. Co.*, 304 F.Supp.2d 284, 289 n. 6 (D.Conn.2004) (holding that there was no consideration for the promises in Allstate's quality service pledge, because the pledge did not indicate that its promises were conditioned upon the claimant not retaining counsel); *cf. Allen v. Aetna Cas. & Surety Co.*, 222 Va. 361, 281 S.E.2d 818, 819 (1981) (per curiam) (suggesting that one person's promise to settle another's claim in exchange for the other's promise to forbear from employing counsel and instituting suit was adequate consideration to support a contract). Absent conduct probative of an exchange, there was no consideration.

■ A substitute for consideration is detrimental reliance. *See Hipsky*, 304 F.Supp.2d at 289. Young maintains that she relied on Allstate's pledge representations to her detriment by forbearing from legal counsel for a year. She does not, however, explain how she was prejudiced by her lack of legal counsel for that period. Nor does she assert that she would have investigated the accident any differently or that her case suffered as a result of the delay. *See Leal v. Allstate Ins. Co.*, 199 Ariz. 250, 17 P.3d 95, 99 (Ct.App.2000) (holding that claimants did not detrimentally rely on upon Allstate's quality service pledge because the claimants did not allege that "they gave Allstate documents that otherwise they would not have provided, that their case suffered due to delay in hiring an attorney, or that they would have investigated differently had they not relied on the [pledge]"). Consequently, we do not believe that Young sufficiently alleged that she detrimentally relied upon the pledge.

In the absence of either detrimental reliance or consideration, it follows that there was no contract between Young and Allstate. *See Douglass*, 110 Hawai'i at 534, 135 P.3d at 143; *Hipsky*, 304 F.Supp.2d at 289. Absent a contract and because Young's claim was premised upon the existence of a contract, her claim for breach of the assumed duty of good faith and fair dealing must fail. We therefore hold that the circuit court correctly dismissed Young's claim of "assumed" duty of good faith and fair dealing.

**D. The Circuit Court Erred In Dismissing Young's IIED Claim.**

■ Young's final point of error on appeal is that the circuit court erred by dismissing her claim of IIED against Defendants where "she was intentionally misled by Allstate, in an attempt to gain and exploit her trust ... [and] take advantage of her by settling her claim for next to nothing." She alleges that Allstate intentionally misled her and then, after she brought the suit, appealed the arbitration award and refused to settle the case for what it was worth. As a result, Mrs. Young asserts that she suffered "unnecessary physical distress, severe

shame, anxiety, worry, mental and emotional distress, fear, loss of time and expenses."

Allstate counters that its "conduct cannot qualify as 'outrageous' or 'beyond all bounds of decency' even under the most liberal interpretation." It contends that "all [Young] alleges is that the defendants continued to defend her claims against [the insured]" and engaged in "ordinary litigation conduct" after a point at which, she believes, "liability and damages were clear." In our view, however, Young's first amended complaint sufficiently stated the second element of IIED-"that the act was outrageous."

■■■■ As previously stated, the tort of IIED consists of four elements: "1) that the act allegedly causing the harm was intentional or reckless, 2) that the act was outrageous, and 3) that the act caused 4) extreme emotional distress to another."[26] *Hac*, 102 Hawai'i at 106–07, 73 P.3d at 60–61. "The term 'outrageous' has been construed to mean without just cause or excuse and beyond all bounds of decency." *Enoka v. AIG Hawai'i Ins. Co., Inc.*, 109 Hawai'i 537, 559 128 P.3d 850, 872 (2006) (citations and some internal quotation marks omitted). "The question whether the actions of the alleged tortfeasor are unreasonable or outrageous is for the court in the first instance, although where reasonable people may differ on that question it should be left to the jury." *Takaki v. Allied Machinery Corp.*, 87 Hawai'i 57, 68, 951 P.2d 507, 518 (App.1998) (quotations and quotation marks omitted).

Here, the insured informed Allstate that he caused the traffic accident because he fell asleep at the wheel. Although Allstate was aware of its insured's liability, one of Allstate' claim representatives immediately contacted Young and assured her that it would treat her fairly and provide "quality service" on

her claim. Thereafter, Allstate affirmed its commitment to provide her "quality service" in a letter from her "claim representative." The letter also included the pledge which *promised* quality service—*promising* that it would (1) "fully explain the process, take the time to answer all questions and concerns that [she] may have, and keep [her] informed throughout the claim process"; (2) "conduct a quick, fair investigation of the facts in [her] case"; and (3) assist in the repair of her vehicle. A subsequent pledge promised her, "If you qualify, *we will* make an appropriate offer of compensation for any injuries you may have suffered." (Emphasis in original.) This pledge of an "appropriate" offer of compensation served to reinforce Allstate's earlier representation that, because it would provide Young with "quality" service and treat her "fairly," she did not need an attorney.

Despite Young's medical expenses in excess of $6,000 and Allstate's repeated promises to treat her fairly, however, it offered her a mere $5,000 and then, upon Young's rejection of this offer, raised its offer to $5,300. Young, who was eighty-five years old at the time, and had sustained permanent injuries, rejected this offer. Subsequently, even after the arbitrator awarded Young $7,689.51 in medical damages and $37,000 in general damages, Allstate refused to increase its nominal settlement offer, again offering only $5,300 and rejecting Young's $25,000 offer of judgment.

In light of Young's ultimate award of over $250,000, Allstate's promise "to make an appropriate offer of compensation," and Allstate's highest pre-jury offer of $5,300, reasonable people could differ as to whether the Defendants acted without just cause or excuse and beyond all bounds of decency in the underlying case.[27] We believe that, upon

---

26. Also, "extreme emotional distress" constitutes, among other things, mental suffering, mental anguish, nervous shock, and other "highly unpleasant mental reactions." *Enoka v. AIG Hawai'i Ins. Co., Inc.*, 109 Hawai'i 537, 559, 128 P.3d 850, 872 (2006) (citations and some internal quotation marks omitted). "[M]ental distress may be found where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Shoppe v. Gucci Am., Inc.*, 94 Hawai'i 368, 387, 14 P.3d 1049,

1068 (2000) (quoting *Rodrigues v. State*, 52 Haw. 156, 173, 472 P.2d 509, 520 (1970)).

27. *See Metayer v. PFL Life Ins. Co.*, Civ. No. 98–177–P–C, 1999 WL 33117063, *11, 1999 U.S. Dist. LEXIS 23432, at *33 (D.Me. July 15, 1999) (holding that a reasonable jury could find that an insurer acted outrageously by training its agents to represent to customers that a certain insurance policy covered one hundred percent of the medical costs related to accidental injuries, even though that representation was false, and to

reading Young's first amended complaint, average members of our community might indeed exclaim, "Outrageous!" *See Dunlea,* 83 Hawai'i at 38, 924 P.2d at 206. The circuit court should therefore have left the question of outrageousness to the jury. It erred in determining that the first amended complaint failed to state the second element of IIED.

The remaining three elements are not in dispute. *See Brooks,* 113 Hawai'i at 415, 153 P.3d at 1100. The Defendants do not contend, and the circuit court did not conclude, that the first amended complaint failed to state the first, third, or fourth element of IIED. Indeed, we believe that the complaint plainly alleged those elements by averring that the Defendants' intentional conduct caused Young to experience severe anxiety, worry, fear, and mental and emotional distress. Thus, the first amended complaint sufficiently stated a claim of IIED. We therefore hold that the circuit court erred in dismissing Young's IIED claim.

## IV. CONCLUSION

Based upon the foregoing analysis, we affirm the circuit court's September 17, 2004 judgment in favor of Defendants on Young's claims for abuse of process, malicious defense, and breach of an assumed duty of good faith and fair dealing. We further vacate the circuit court's September 17, 2004 judgment on Young's IIED claim and remand the case for further proceedings.

Concurring and Dissenting Opinion by LEVINSON, J., with whom ACOBA, J., Joins.

I agree with the majority's analysis and disposition of the plaintiff-appellant Priscilla Young's claims of abuse of process, bad faith, and intentional infliction of emotional distress (IIED). Majority opinion at 406, 412–16, 427–30, 198 P.3d at 669, 675–79, 690–93. I disagree, however, with its conclusion that

the third circuit court correctly dismissed Young's claim of "malicious defense." *See id.* at 406, 412, 416–26, 430, 198 P.3d at 669, 675, 679–89 693. The claim borrows concepts from the tort of malicious prosecution. To establish a claim for malicious prosecution, a plaintiff must show that the prior proceedings were (1) terminated in his or her favor, (2) initiated by the defendant without probable cause, and (3) initiated by the defendant with malice. *Wong v. Cayetano,* 111 Hawai'i 462, 478, 143 P.3d 1, 17 (2006). The tort thus serves to protect "[t]he interest in freedom from unjustifiable litigation." *Prosser and Keeton on Torts* § 119, at 870 (5th ed., W. Page Keeton *et al.* eds., 1984). Such conduct is actionable when perpetrated by plaintiffs, but not defendants, because, by definition, the tort only provides a remedy for malicious "prosecutions." *See Wong,* 111 Hawai'i at 478, 143 P.3d at 17. That distinction between plaintiffs and defendants has led some commentators to consider whether, consistent with the underpinnings of the tort of malicious prosecution, courts should recognize a tort for malicious defense in civil cases. *See* Jonathan K. Van Patten & Robert E. Willard, *The Limits of Advocacy: A Proposal for the Tort of Malicious Defense in Civil Litigation,* 35 Hastings L.J. 891 (1984) [hereinafter, "Van Patten & Willard, *The Limits of Advocacy*"]; William T. Barker *et al., Litigating About Litigation: Can Insurers be Liable for Too Vigorously Defending Their Insureds?,* 42 Tort & Ins. L.J. 827 (2007).

One court has. In *Aranson v. Schroeder,* the New Hampshire Supreme Court recognized the tort of malicious defense, adopting the following standard:

> "One who takes an active part in the initiation, continuation, or procurement of the defense of a civil proceeding is subject to liability for all harm proximately[, *i.e.,* legally,] caused, including reasonable attorneys' fees, if

spend as little time as possible explaining the scope of coverage provided by the plan); *cf. Cassidy v. Millers Cas. Ins. Co.,* 1 F.Supp.2d 1200, 1203–04, 1213 (D.Colo.1998) (explaining that the insurers' alleged "pattern of conduct" that was intended to cause or recklessly did

cause severe emotional distress to the third party claimants was outrageous, because the conduct included, among other things, forcing the claimants into vexatious and frivolous litigation in four different courts and employing arbitration as an abusive and delaying tactic).

(a) he or she acts without probable cause, *i.e.*, without any credible basis in fact and such action is not warranted by existing law or established equitable principles or a good faith argument for the extension, modification, or reversal of existing law,

(b) with knowledge or notice of the lack of merit in such actions,

(c) primarily for a purpose other than that of securing the proper adjudication of the claim and defense thereto, such as to harass, annoy or injure, or to cause unnecessary delay or needless increase in the cost of litigation,

(d) the previous proceedings are terminated in favor of the party bringing the malicious defense action, and

(e) injury or damage is sustained."

140 N.H. 359, 671 A.2d 1023, 1028–29 (1995) (quoting Van Patten and Willard, *The Limits of Advocacy,* 35 Hastings L.J. at 933–34).

There is no question that Young's first amended complaint, in substance, alleged the foregoing elements. It asserted that the defendants-appellees Allstate Insurance Company (Allstate) and Mark T. Ichiyama (collectively, the Defendants) took an active role in defending the underlying case without probable cause. The Defendants filed an answer that denied liability and asserted that Young had been injured by her own negligence, that she had failed to mitigate her injuries, that she had filed her suit beyond the statute of limitations, that her claims were barred by her own unclean hands, and that she was estopped from bringing suit by her own wrongful conduct. Young's first amended complaint alleged that the Defendants were, however, well aware that the February 4, 1998 collision was caused solely by the negligence of Allstate's insured, Daryl Fujimoto, who had already admitted to Allstate that he had fallen asleep at the wheel. The first amended complaint alleged that the Defendants were also aware that the defenses were groundless, that they raised the defenses to harass, annoy, or injure Young by unnecessarily delaying her case and by needlessly increasing the cost of litigation, litigation that ultimately terminated in her favor after she received a jury verdict of $198,971.71. And Young's first amended complaint alleged

that, as a result of the foregoing conduct, she sustained injury and damage in the form of mental and emotional distress, suffering through the time and expense of arbitration and a full-blown trial. Neither the Defendants nor the majority disputes that these allegations would state a claim for malicious defense were we to recognize the claim. *See* majority opinion at 416–26, 198 P.3d at 679–89.

The question is thus whether we should recognize the tort of malicious defense. Young argues that we should because the tort advances the same interests as the tort of malicious prosecution, the origins of which reach back to the early development of our common law, *see, e.g., Kerr v. Hyman Bros.,* 6 Haw. 300, 302 (1881). Both torts hold parties accountable for their wrongful conduct in litigation. Malicious prosecution claims impose liability upon plaintiffs for asserting claims that are malicious, frivolous, unsuccessful, and injurious. *See Wong,* 111 Hawai'i at 478, 143 P.3d at 17. Malicious defense actions hold defendants responsible for raising defenses of the same character. *See Aranson,* 671 A.2d at 1028–29. Neither tort imposes liability for mere vigorous advocacy; liability attaches only when parties maliciously advance groundless and unsuccessful claims or defenses. *See Wong,* 111 Hawai'i at 478, 143 P.3d at 17; *Aranson,* 671 A.2d at 1028–29. The strict requirements of malice, lack of "probable cause," and favorable prior disposition serve to minimize the chilling effect that the imposition of liability may have on zealous advocacy because those requirements render vigorous claims and defenses readily distinguishable from malicious ones. *See* Barbra Glesner Fines, *Speculating on the Future of Attorney Responsibility to Nonclients,* 37 S. Tex. L.Rev. 1283, 1302 (1995) [hereinafter, "Fines, *Speculating on the Future* "] ("[Malicious defense] is an intentional tort based on the affirmative misconduct of an attorney. To that extent, the[ ] doctrines [of malicious defense and malicious prosecution] pose little challenge to attorneys either philosophically or pragmatically."); Van Patten & Willard, *The Limits of Advocacy,* 35 Hastings L.J. at 920 ("[A] vigorous defense can be distinguished from a mali-

cious defense."); Francis J. Mootz III, *Holding Liability Insurers Accountable for Bad Faith Litigation Tactics With the Tort of Abuse of Process,* 9 Conn. Ins. L.J. 467, 501–02 (2002/2003) [hereinafter, "Mootz, *Holding Liability Insurers Accountable* "] (explaining that, "[a]lthough courts certainly should not circumscribe the ability of a party to defend against claims vigorously, there is a point where the defense becomes malicious rather than vigorous," and that the need to make that distinction "is no different than the same need to draw a line in the malicious prosecution context"). The need to deter the latter "provides a policy justification [for] these doctrines." Fines, *Speculating on the Future,* 37 S. Tex. L.Rev. at 1302; *see also Chung v. McCabe Hamilton & Renny Co.,* 109 Hawai'i 520, 532, 128 P.3d 833, 845 (2006) (observing that malicious prosecution may result in the imposition of punitive damages); Van Patten & Willard, *The Limits of Advocacy,* 35 Hastings L.J. at 916–17.

The majority distinguishes the tort of malicious defense from the tort of malicious prosecution on the ground that the former's "primary purpose" element, *see Aranson,* 671 A.2d at 1029, is easier to satisfy than the latter's "malice" element, *see Wong,* 111 Hawai'i at 478, 143 P.3d at 17. Majority opinion at 419–20, 198 P.3d at 682–83. It observes that we have quoted *Black's Law Dictionary* in defining "malice" as " 'the intent, without justification or excuse, to commit a wrongful act,' 'reckless disregard of the law or of a person's legal rights,' and 'ill will; wickedness of heart.' " *Awakuni v. Awana,* 115 Hawai'i 126, 141, 165 P.3d 1027, 1042 (2007) (quoting *Black's Law Dictionary* 976 (8th ed.2004)) (brackets omitted), *quoted in* majority opinion at 419, 198 P.3d at 682. In addition to generally defining "malice," *Black's Law Dictionary* specifically defines the elements of "malicious prosecution" as including "malice," citing the *Restatement (Second) of Torts* §§ 674–681B (1977). *Black's Law Dictionary* 977. Section 674 of the *Restatement* illustrates that a person acts maliciously when he initiates litigation "primarily for a purpose other than that of securing the proper adjudication of the claim in which the proceedings are based." *Restatement (Second) of Torts* § 674(a); *see also id.*

§ 676 cmt. c; Van Patten and Willard, *The Limits of Advocacy,* 35 Hastings L.J. at 931–32; *Myers v. Cohen,* 5 Haw.App. 232, 236–37, 687 P.2d 6, 11 (1984), *rev'd on other grounds by* 67 Haw. 389, 688 P.2d 1145 (1984). Like the *Restatement,* Professor Prosser's treatise teaches that "malice" has been found where "the proceeding was begun primarily for a purpose other than the adjudication of the claim in suit." *Prosser and Keeton on Torts* § 120, at 895. Thus, for purposes of a malicious prosecution claim, a person acts with malice where he initiates the case primarily for a purpose other than the proper adjudication of the claims at issue in the action. *See id.; Restatement (Second) of Torts* § 674(a); Van Patten and Willard, *The Limits of Advocacy,* 35 Hastings L.J. at 931–32; *Myers,* 5 Haw.App. at 236–37, 687 P.2d at 11. The tort of malicious defense demands nothing less. *See Aranson,* 671 A.2d at 1029. Accordingly, I do not believe that the mental state required by the tort of malicious defense is any less exacting than the requisite state of mind for the tort of malicious prosecution.

In addition, the majority draws a distinction between the two torts in light of the position of the parties in the predicate proceedings. It accepts the Defendants' argument that, unlike a plaintiff, a defendant is involuntarily haled into court and, consequently, although the plaintiff is liable in tort for maliciously asserting baseless and unsuccessful claims, the defendant should not likewise incur liability for advancing defenses cut from the same cloth. *See* majority opinion at 420–21, 198 P.3d at 683–84. I disagree with the notion that a defendant, particularly one who asserts a malicious defense, is involuntarily haled into court. *See* Van Patten & Willard, *The Limits of Advocacy,* 35 Hastings L.J. at 920. To illustrate, "[a] defendant who, in bad faith, forces a plaintiff to prove the validity of an obligation or debt that the parties know to be legitimate has in effect precipitated the litigation by the unjustified refusal to pay." *Id.*

Furthermore, the argument advanced by the majority and the Defendants rests on the false premise that, by initiating the action, the plaintiff somehow assumes the risk that

the defendant may maliciously defend against his claims by taking frivolous positions. *See* majority opinion at 420–21, 198 P.3d at 683–84. Such conduct is plainly subject to sanctions pursuant to our rules of procedure and the inherent powers of our courts. *See* Hawai'i Rules of Civil Procedure (HRCP) Rule 11; *Kawamata Farms v. United Agri Prods.,* 86 Hawai'i 214, 257, 948 P.2d 1055, 1098 (1997). Those authorities, which permit recovery of attorneys fees, *see* HRCP Rule 11(c)(2); *Kawamata Farms,* 86 Hawai'i at 257, 948 P.2d at 1098, along with Hawai'i Revised Statutes (HRS) § 636–16, which awards prejudgment interest for delays in litigation, *see Schmidt v. Bd. of Dirs. of Ass'n of Apartment Owners of Marco Polo Apartments,* 73 Haw. 526, 534, 836 P.2d 479, 13 (1992), do not, however, provide a complete remedy for the potential damages that malicious defenses inflict. A plaintiff may additionally suffer reputational, psychic, and emotional harm as a result of such defenses in the same way that a defendant may incur general damages from the malicious assertion of groundless claims. *See Aranson,* 671 A.2d at 1028 (observing that, "when a defense is commenced maliciously or is based upon false evidence and perjury or is raised for an improper purpose, the litigant is not made whole if the only remedy is reimbursement of counsel fees"); *see also Prosser and Keeton on Torts* § 119, at 887 (explaining that general damages are recoverable in a malicious prosecution case). The harms are no different. *See Aranson,* 671 A.2d at 1027 (noting that a plaintiff is no "less aggrieved when the groundless claim put forth in the courts is done defensively rather than affirmatively in asserting a worthless lawsuit for improper purposes"). Consequently, I believe that parties aggrieved by malicious defenses should be "entitled to the same damages as are recoverable in a malicious prosecution claim." *See id.* at 1028; Van Patten & Willard, *The Limits of Advocacy,* 35 Hastings L.J. at 919 ("It makes no sense that a plaintiff should be denied access to the courts to recover for malicious defensive tactics in a jurisdiction where a defendant's right to recover for the same kind of injury is generally accepted."). Because such injuries are not fully redressable through our procedural rules, the inherent powers of our courts, or HRS § 636–16, recovering them via a malicious defense claim will not, as the majority believes, *see* majority opinion at 424–25, 198 P.3d at 687–88, result in a plaintiff recovering twice for the same injury.

To be sure, damages for emotional distress caused by maliciously asserted defenses may, in some cases, be recoverable through an IIED claim. *See id.* at 425–26, 198 P.3d at 688–89. An IIED claim is, however, aimed at a different sort of wrongful conduct than a malicious defense claim. The tort of IIED imposes liability for outrageous conduct, *Brooks v. Dana Nance & Co.,* 113 Hawai'i 406, 415, 153 P.3d 1091, 1100 (2007), whereas the tort of malicious defense imposes liability for malicious defenses, *Aranson,* 671 A.2d at 1028–29. The assertion of a malicious defense may, in some extreme cases, constitute outrageous conduct, particularly where the defenses are part of a larger scheme of improper conduct. *See* majority opinion at 428–30, 198 P.3d at 691–93. Still, as a general matter, the mere assertion of a malicious defense will not, without more, rise to the level of outrageousness sufficient to sustain an IIED claim. *Cf. Harrison v. Luse,* 760 F.Supp. 1394, 1402–03 (D.Colo.1991) (holding, under the circumstances of the case, that the filing of a frivolous and groundless civil action and the filing of another civil action for the purpose of harassing, embarrassing, inconveniencing, and intimidating the defendant did not reach the threshold level of conduct necessary to support a claim for outrageous conduct); *Early Detection Ctr., P.C. v. New York Life Ins. Co.,* 157 Mich. App. 618, 403 N.W.2d 830, 834 (1986) (holding that the filing of a groundless lawsuit was not of such an extreme nature so as to be characterized as outrageous and atrocious). For example, in the present matter, if Young had alleged that the Defendants' malicious defenses were the sole factual basis for her IIED claim, her claim would fail as a matter of law. It is because of Young's additional allegations pertaining to the Defendants' larger pattern of conduct that we conclude that she has stated an IIED claim. *See*

majority opinion at 428–30, 198 P.3d at 691–93.

The majority seems to suggest that, because Young has stated a claim of IIED for which relief can be granted, we should not recognize the tort of malicious defense, in light of the fact that the tort of IIED offers the same remedies for her injuries as the tort of malicious defense. *Id.* at 426, 198 P.3d at 689. Although it is clear that Young has successfully *stated* claims of both IIED and malicious defense and that both claims afford tort remedies, *see id.*, there is no way of knowing in this appeal from a HRCP Rule 12(b)(6) dismissal whether Young will be able to *prove* both claims at trial. Her chances of establishing liability are better with respect to her malicious defense claim than with respect to her IIED claim, because, as previously stated, the malicious defense claim would require proof of fewer facts than the IIED claim. Thus, if this court were to decline to recognize the tort of malicious defense and Young were unable to prove her IIED claim, but she could have proven her malicious defense claim, then the tort of IIED would not provide her with an adequate remedy for the Defendants' assertion of malicious defenses. She should be afforded an opportunity to prove each of her claims for which relief can be granted. The fact that the relief potentially provided by her malicious defense and IIED claims may overlap is no reason to refuse to recognize the tort of malicious defense, which serves to protect against a different, albeit narrower, class of wrongful conduct than the tort of IIED. *See Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 783 P.2d 781, 785–86, 788 (1989) (recognizing the tort of false light invasion of privacy despite the defendants' contention that the tort overlapped with the already-recognized tort of IIED, because, although the torts might address the same injury and although a false publication might, in some cases, constitute outrageous conduct and vice versa, the same wrongful conduct would not always satisfy the elements of both torts, such that each tort had its place in protecting against a different type of conduct).

The majority next maintains that recognizing the tort of malicious defense would contravene the policies underlying the litigation privilege. Majority opinion at 421, 198 P.3d

at 684. Attorneys have an "absolute litigation privilege in defamation actions for words and writings that are material and pertinent to judicial proceedings." *Matsuura v. E.I. du Pont de Nemours & Co.*, 102 Hawai'i 149, 154, 73 P.3d 687, 692 (2003).

> [T]he interrelated policies associated with the litigation privilege include: (1) promoting the candid, objective, and undistorted disclosure of evidence; (2) placing the burden of testing the evidence upon the litigants during trial; (3) avoiding the chilling effect resulting from the threat of subsequent litigation; (4) reinforcing the finality of judgments; (5) limiting collateral attacks upon judgments; (6) promoting zealous advocacy; (7) discouraging abusive litigation practices; and (8) encouraging settlement.

*Id.* at 155, 73 P.3d at 693; *see also Silberg v. Anderson*, 50 Cal.3d 205, 266 Cal.Rptr. 638, 786 P.2d 365, 369–70 (1990). The litigation privilege does not, however, apply to claims for malicious prosecution, because the policies favoring the privilege are " 'outweighed by the policy of affording redress for individual wrongs when the requirements of favorable termination, lack of probable cause, and malice are satisfied.' " *Silberg*, 266 Cal.Rptr. 638, 786 P.2d at 371 (quoting *Albertson v. Raboff*, 46 Cal.2d 375, 295 P.2d 405, 410 (1956)); *accord Loigman v. Twp. Comm.*, 185 N.J. 566, 889 A.2d 426, 436 n. 4 (2006); *Clark v. Druckman*, 218 W.Va. 427, 624 S.E.2d 864, 871 (2006); *cf. Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel*, 113 Hawai'i 251, 268–69, 151 P.3d 732, 749–50 (2007) (quoting *Clark*, 624 S.E.2d at 870 (quoting *Baglini v. Lauletta*, 338 N.J.Super. 282, 768 A.2d 825, 833–34 (App.Div.2001))). The very same requirements are found in the tort of malicious defense, *see Aranson*, 671 A.2d at 1028–29, and, as such, the policy of affording redress for malicious defenses overrides the policies of the litigation privilege, *cf. Silberg*, 266 Cal.Rptr. 638, 786 P.2d at 371. Thus, the majority's argument that the policies underlying the litigation privilege and the tort of malicious defense are at odds is correct as far as it goes. It simply falls short of providing a convincing reason to reject the tort of malicious defense any more than it would

justify abandoning the tort of malicious prosecution.

The majority, along with the Defendants, asserts that recognizing the tort of malicious defense will lead to never-ending litigation. See majority opinion at 421–22, 198 P.3d at 684–85. But the same argument could be made with respect to the tort of malicious prosecution. Mootz, *Holding Liability Insurers Accountable*, 9 Conn. Ins. L.J. at 502 ("Although the never-ending litigation is a legitimate fear, it is no less a fear in the context of malicious prosecution."). The reason that malicious prosecution and malicious defense claims do not produce a Russian nesting doll of litigation [1] is that they are premised upon exacting elements that are narrowly construed. See Fines, *Speculating on the Future*, 37 S. Tex. L.Rev. at 1301 (explaining that the *Aranson* court was not concerned with the threat of increasing litigation, because malicious defense, like malicious prosecution, "would 'be scrutinized closely and construed narrowly'" (quoting *Aranson*, 671 A.2d at 1028)); see also Van Patten & Willard, *The Limits of Advocacy*, 35 Hastings L.J. at 921 ("Malicious prosecution actions have not clogged the courts or led to unending litigation."). Indeed, despite the fact that New Hampshire has recognized the tort of malicious defense for the past thirteen years, see *Aranson*, 671 A.2d at 1028–29, my research has uncovered all of two federal cases applying New Hampshire law that involved malicious defense claims, see *Dias v. Bogins*, No. 97–1612, 1998 WL 13089, *1, 1998 U.S.App. LEXIS 536, at *3 (1st Cir. Jan. 13, 1998) (unpublished opinion) (holding that the plaintiff failed to state a claim of malicious defense); *Bezanson v. Thomas (In re R & R Assocs.)*, No. 91–10983–MWV, 2003 WL 1233047, **1, 3, 2003 Bankr.LEXIS 205, at *2, *8 (D.N.H.Bankr. Jan. 31, 2003) (unpublished opinion) (observing that, in response to a counterclaim, a party had asserted a counterclaim for malicious defense), *aff'd in part and vacated in part by* Civil No. 03–127–JD, 2003 WL 21434911, 2003 U.S. Dist. LEXIS 10693

(D.N.H. June 20, 2003). To my knowledge, the New Hampshire Supreme Court has yet to issue a single decision concerning the tort of malicious defense since it first handed down *Aranson*. Thus, the tort does not appear to have spawned a single appeal in the state's courts, much less led to an inundation of malicious defense claims. Cf. *Godbehere*, 783 P.2d at 787 (rejecting the argument that recognizing the tort of false light invasion of privacy would invite much new litigation, because only four such cases had been presented in Arizona and because other states that had recognized the tort had not been deluged with substantially more false-light litigation than Arizona). Furthermore, the notion that recognizing the tort of malicious defense would result in a flood of litigation "has accompanied virtually every innovation in the law." *Fergerstrom v. Hawaiian Ocean View Estates*, 50 Haw. 374, 377, 441 P.2d 141, 143 (1968).

> Assuming that it is true, that fact is unpersuasive unless the litigation largely will be spurious and harassing. Undoubtedly, when a court recognizes a new cause of action, there will be many cases based on it. Many will be soundly based and the plaintiffs in those cases will have their rights vindicated. In other cases, plaintiffs will abuse the law for some unworthy end, but the possibility of abuse cannot obscure the need to provide an appropriate remedy.

*Id.* at 377, 441 P.2d at 143–44 (recognizing the tort of invasion of privacy).

Apart from their attempt to distinguish malicious defenses from malicious prosecutions, the Defendants argue that special considerations arise in the insurance context that require this court to reject the tort of malicious defense. They reason that, because an insurer owes a contractual duty to defend its insured in litigation, it automatically stands in an adversarial relation to a third-party claimant who has filed suit against its insured. The Defendants insist that, just as a third party cannot compel the insured to

---

1. See *Athridge v. Aetna Cas. & Sur. Co.*, 163 F.Supp.2d 38, 54 (D.D.C.2001), *rev'd on other grounds by* 312 F.3d 474 (D.C.Cir.2002) (arguing that, if every litigant could use his opponent's activities in litigation as the predicate for a second action, lawsuits would "become like the Russian Doll in which there is a Russian Doll in which there is a Russian doll *ad infinitum* ").

negotiate and settle at a loss, he is equally incapable of requiring the insurer to negotiate a favorable settlement or assume a more reasonable defensive strategy. Liability for malicious defense is not, however, premised upon a refusal to settle as such or for assuming a reasonable defense strategy; it attaches when a defendant maliciously asserts groundless and unsuccessful defenses. *See Aranson,* 671 A.2d at 1028–29. Thus, I do not believe that any special considerations in the insurance context militate against the recognition of the tort.

This case presents a question of first impression in Hawai'i. It is for that reason that the Defendants' reliance on the Kansas Supreme Court's decision in *Wilkinson v. Shoney's, Inc.,* 269 Kan. 194, 4 P.3d 1149 (2000), is misplaced. There, after explaining that its caselaw had rejected a claim for malicious defense since 1910, the court stated that it was not prepared to recognize a new cause of action for malicious defense. *Id.* at 1157–59 (citing *Baxter v. Brown,* 83 Kan. 302, 111 P. 430 (1910)). The *Wilkinson* court concluded that, if such an action were deemed desirable or needed, action by the legislature would be required, especially in light of the court's "long-standing recognition of the law to the contrary." *Id.* at 1159. In the present matter, the Defendants maintain that, as was the case in Kansas, if the tort of malicious defense were deemed desirable or needed in this jurisdiction, action by the Hawai'i legislature would be necessary. Yet, unlike the Kansas Supreme Court, *see id.* at 1157–59, the appellate courts in this jurisdiction have not discussed, much less rejected, the tort of malicious defense. Putting aside the distinction between Hawai'i and Kansas caselaw, the Defendants' argument could be understood as an assertion that, because Hawai'i has never recognized a claim for malicious defense, action by the legislature would be required to recognize the tort in this jurisdiction. That very argument was rejected by this court long ago when it concluded

that: "The error in the defendant's position approaches Brobdingnagian [2] proportions. To accept it would constitute more than accepting a limited view of the essence of the common law. It would be no less than an absolute annihilation of the common law system." *Fergerstrom,* 50 Haw. at 375, 441 P.2d at 142.

" '[T]he genius of the common law, upon which our jurisprudence is based, is its capacity for orderly growth.' " *Id.* at 376, 441 P.2d at 143 (quoting *Lum v. Fullaway,* 42 Haw. 500, 502 (1958)) (brackets in original). Its branches sprout by analogy. In view of the similarities between malicious prosecutions and malicious defenses, I would recognize the tort of malicious defense in civil cases and adopt the standard articulated by the New Hampshire Supreme Court in *Aranson,* 671 A.2d at 1028–29. *Cf. James W. Glover, Ltd. v. Fong,* 40 Haw. 503, 511–12 (Terr.1954) (recognizing a claim in tort for "a willful and malicious making of a false return [3] with intent to injure as a part of a persistent and deliberate attempt to evade performance of a purely ministerial duty," in part because such conduct was similar "to the comparable misconduct on which is based an action for malicious prosecution"). In this case, as previously noted, Young has stated a claim for malicious defense in her first amended complaint for which relief can be granted. Accordingly, I would hold that the circuit court erred in dismissing that claim and I would therefore vacate its September 17, 2004 judgment as to that claim.

---

2. "Brobdingnagian" means "[c]olossal; of extraordinary size; gigantic." *Webster's New International Dictionary* 399 (2d ed.1960). The word derives from "Brobdingnag," an imaginary country from Jonathan Swift's *Gulliver's Travels* where "everything is on an enormous scale." *Id.*

3. A "false return" is "[a] process server's or other court official's recorded misrepresentation that process was served, that some other action was taken, or that something is true." *Black's Law Dictionary* 636.